# IN THE SUPREME COURT OF CALIFORNIA


THE PEOPLE,
Plaintiff and Respondent,

v.

JOSEPH VEAMATAHAU,
Defendant and Appellant.


S249872


First Appellate District, Division One
A150689


San Mateo County Superior Court
SF398877A

---


February 27, 2020


This opinion follows companion case S248730,
also filed on February 27, 2020.


Chief Justice Cantil-Sakauye authored the opinion of the
Court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger
and Groban concurred.

---

PEOPLE v. VEAMATAHAU

S249872


Opinion of the Court by Cantil-Sakauye, C. J.


Evidence Code section 802 allows a testifying expert to "state on direct examination the reasons for his opinion and the matter (including . . . his special knowledge, skill, experience, training, and education) upon which it is based." So long as the matter is "of a type that reasonably may be relied upon by an expert," it may be relayed to the factfinder "whether or not admissible." (Evid. Code, § 801, subd. (b); all further unspecified statutory references are to the Evidence Code.) Accordingly, to support his opinion, an expert is permitted to relate to the jury background information that is technically hearsay, including general knowledge and "premises generally accepted in his field." (*People v. Sanchez* (2016) 63 Cal.4th 665, 685 (*Sanchez*).) The expert, however, cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.)

In this case, we determine whether an expert related impermissible case-specific hearsay. The expert told the jury that he identified the controlled substance the defendant was charged with possessing by comparing the visual characteristics of the pills seized against a database containing descriptions of pharmaceuticals. The expert testified that this procedure was "the generally accepted method of testing for this kind of substance in the scientific community," and his search on the database led him to the conclusion that the pills contained

1

alprazolam, the generic name for Xanax. The expert also revealed the contents of the database, stating that if one looks up a particular imprint number, "[the database is] going to tell you that . . . [a pill bearing such imprint] contains alprazolam, 2 milligrams." After hearing this testimony and other evidence, the jury convicted defendant of possession of alprazolam.

Defendant appealed, asserting that the expert testimony violated *Sanchez*'s prohibition against communication of case-specific hearsay. The Court of Appeal disagreed. It concluded that the "testimony about the database, while hearsay, was not case specific, but the type of general background information which has always been admissible when related by an expert." (*People v. Veamatahau* (2018) 24 Cal.App.5th 68, 73 (*Veamatahau*).) The court further found sufficient evidence supported defendant's conviction for possession of alprazolam.

We agree with the Court of Appeal on both of these issues and affirm its judgment in its entirety.

## I. BACKGROUND

In June 2015, an East Palo Alto police officer, Sergeant Clint Simmont, spotted defendant Joseph Veamatahau's vehicle making an unlawful turn. The officer activated his lights, and defendant fled but was eventually apprehended. A search of defendant's person and vehicle revealed a plastic bag containing what turned out to be cocaine base and — as is relevant for this appeal — pills wrapped in cellophane inside his pocket. Sergeant Simmont arrested defendant and interrogated him at the police station. A recording of the interview was played for the jury. During the interrogation, the officer asked defendant about the pills, saying, "What about the pills that you had, the bars? The Xanibars?" Defendant responded, "I take those," and

admitted to taking "a lot," "four or five" pills "[e]very day," "until I feel good."

At trial, Sergeant Simmont testified concerning his experience in narcotics investigation and referred to the pills recovered as "Xanax pills." Scott Rienhardt, a criminalist from the San Mateo County Sheriff's Office Forensic Laboratory, also testified. Rienhardt worked in the "controlled substances . . . and toxicology unit" at the laboratory, where he had been employed for seven years. Rienhardt held a degree in "chemistry, with an emphasis in analytical chemistry" and had previously worked for the Drug Enforcement Administration. Over the course of his career, he had tested for controlled substances "thousands of times." Specific to "alprazolam . . . otherwise known as Xanax," Rienhardt had identified the drug "in the hundreds" of times. Based on this testimony, the court designated Rienhardt as "an expert in the area of forensic testing of controlled substances, specifically heroin, cocaine base, and alprazolam."

Rienhardt then testified regarding the process by which "evidence comes into the lab to be tested after it's been seized by the police." Rienhardt's testimony, along with Sergeant Simmont's, established that Rienhardt examined the pills recovered from defendant. The prosecutor then asked Rienhardt if he was "able to identify the contents" of the pills. Rienhardt responded affirmatively. When the prosecutor inquired about the method by which Rienhardt performed the identification, Rienhardt explained he used "a database that [he] searched against [] the logos that were on the tablets." Following up on the explanation, the prosecutor asked, "Is that the generally accepted method of testing for this kind of substance in the scientific community?" Rienhardt confirmed

that it was. He then opined that, as a result of following this method, he "found the tablets to contain alprazolam."

On cross-examination, defense counsel attempted to cast doubt on Rienhardt's identification. Counsel first asked whether Rienhardt performed chemical tests on the pills. Rienhardt said he did not and explained that such tests were not the procedure followed by the San Mateo Forensic Laboratory. Counsel then suggested that a visual examination did not rule out the possibility that the tablets "could be something else." Rienhardt's response indicated why he did not believe the tablets were "something else." According to Rienhardt, when "there's a controlled substance in the tablet, the FDA requires companies to have a distinct imprint on those tablets to differentiate it from any other tablets. The FDA regulates that. [¶] And if there's a tablet that has — in this case GG32 — or 249 [as an imprint] — you can look that up. And it's going to tell you that it contains alprazolam, 2 milligrams. And that's — we trust that, all those regulations being in place, to say that there's alprazolam in those tablets." Rienhardt conceded, however, that he did not "know who put those little letters" on the tablets.

At the end of the prosecutor's presentation of evidence, and outside of the presence of the jury, defendant moved for acquittal under Penal Code section 1118.1. Defendant faulted the prosecution for not having performed a "traditional test . . . where you actually test the substance." "The only evidence provided," claimed defendant, was "a visual test to compare that it's a Xanax pill," and "that's [not] enough for the jury . . . to go back and deliberate about." The court denied the motion. As it explained, "Mr. Rienhardt testified that method that he used is the one generally accepted in the scientific community. The jury

can decide what weight to give the fact that they were identified by physical form and not by a chemical test. But Mr. Rienhardt's testimony gives the jur[ors] enough information from which they can make that determination themselves." Defense counsel then argued to the jury during closing statements that the drug identification procedure employed was faulty. Counsel emphasized that Rienhardt "didn't test the Xanax" and merely "guess[ed] it's Xanax . . . [by] look[ing] at the picture" from the database. The jury subsequently convicted defendant of possessing alprazolam.

Defendant appealed his conviction. Before the Court of Appeal, as here, defendant contended "his conviction must be reversed because Rienhardt's testimony relayed case-specific hearsay to the jury which was improper under *Sanchez*." (*Veamatahau*, *supra*, 24 Cal.App.5th at p. 72.) The appellate court rejected the argument, finding that "the only 'case-specific' fact here concerned the markings Rienhardt saw on the pills recovered from defendant." (*Id.* at p. 74.) However, Rienhardt's "testimony about the appearance of the pills was not hearsay . . . because it was based on his personal observation." (*Ibid.*) What was not based on Rienhardt's personal knowledge was information obtained from the database, but this information "was not about the specific pills seized from defendant, but generally about what pills containing certain chemicals look like." (*Id.* at p. 75, fn. omitted.) Although the information "is clearly hearsay, it is the type of background information which has always been admissible under state evidentiary law." (*Ibid.*, fn. omitted.)

The Court of Appeal thus found that Rienhardt's testimony was properly admitted. In reaching this conclusion, the court expressly disagreed with *People v. Stamps* (2016)

5

3 Cal.App.5th 988 (*Stamps*), "a factually similar case" in which the court found that the expert's testimony was inadmissible. (*Veamatahau, supra*, 24 Cal.App.5th at p. 73.) In the unpublished portion of its opinion, the *Veamatahau* court also rejected defendant's claim that insufficient evidence supported his conviction. It therefore affirmed defendant's conviction for possession of alprazolam.

We granted review to resolve the conflict between the decision below and *Stamps*.

## II. ANALYSIS

Our analysis proceeds in two parts. We begin by examining whether the expert related inadmissible case-specific hearsay in testifying to the contents of a database used to identify the chemical composition of the pills recovered from defendant. After resolving this question, we consider whether substantial evidence supports defendant's conviction. For the reasons given below, we conclude that Rienhardt did not relate case-specific hearsay to the jury and that his testimony — along with other evidence — was sufficient to allow a rational jury to convict defendant of possession of alprazolam.

## A. Whether the Expert Related Inadmissible Case-Specific Hearsay

As a preliminary matter, we note that defendant did not object at trial to the introduction of Rienhardt's testimony. However, defendant was convicted two days before we issued *Sanchez*, and, as we have recently decided, the failure to object in such circumstances does not forfeit a defendant's *Sanchez* claim. (*People v. Perez* (Feb. 27, 2020, S082101) __ Cal.5th __.)

In *Sanchez*, we clarified the "proper application" of our evidentiary law as it relates to the intersection of hearsay and expert testimony. (*Sanchez*, *supra*, 63 Cal.4th at p. 670.) We began by explaining that "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Id.* at p. 676.) The reason for this is pragmatic: because " 'experts frequently acquired their knowledge from hearsay, . . . "to reject a professional physician or mathematician because the fact or some facts to which he testifies are known to him only upon the authority of others would be to ignore the accepted methods of professional work and to insist on . . . impossible standards." ' " (*Ibid.*; accord, e.g., Imwinkelried, *The Bases of Expert Testimony: The Syllogistic Structure of Scientific Testimony* (1988) 67 N.C. L.Rev. 1, 9 ["As one court has put it, it would be 'virtually impossible' for a scientist to avoid relying on hearsay sources of information. That observation is an understatement"].) Because experts rely on hearsay knowledge and because a jury "must independently evaluate the probative value of an expert's testimony," including by assessing the basis of the expert's opinion, the expert is entitled to tell the jury the basis or " 'matter' upon which his opinion rests." (*Sanchez*, *supra*, 63 Cal.4th at pp. 685-686.) Hence, "[i]n addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Id.* at p. 675.)

The Legislature codified this common law rule when it enacted the Evidence Code.[1] Section 801 of the Code allows an expert witness to render an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates*, unless an expert is precluded by law from using such matter as a basis for his opinion." (§ 801, subd. (b), italics added.) Section 802 further permits the expert to "state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based." (See also § 721, subd. (a) [providing that "a witness testifying as an expert . . . may be fully cross-examined as to . . . the matter upon which his or her opinion is based and the reasons for his or her opinion"].) In short, not only can an expert "*rely* on hearsay in forming an opinion," he "may tell the jury *in general terms* that he did so." (*Sanchez, supra,* 63 Cal.4th at p. 685.)

By contrast, an expert may not relate inadmissible "*case-specific* facts about which the expert has no independent knowledge." (*Sanchez, supra,* 63 Cal.4th at p. 676.) "Case-specific facts are those relating to the particular events and

---

[1]     Defendant asserts in his reply brief that the "expert's background information hearsay exception is a common law hearsay exception rather than one defined by the Evidence [C]ode." The contention is without merit. Although the rule allowing an expert to testify to general information finds its roots in common law, the rule is now codified. (*Sanchez, supra,* 63 Cal.4th at p. 678.)

participants alleged to have been involved in the case being tried." (*Ibid.*) Testimony relating such facts, unlike testimony about non-case-specific background information, is subject to exclusion on hearsay grounds. (*Id.* at p. 684, fn. omitted ["If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception"].) The distinction between case-specific facts and background information thus is crucial — the former may be excluded as hearsay, the latter may not.

Relying on *Sanchez*, defendant argues that his conviction must be reversed because it was based on inadmissible hearsay "conveyed through expert testimony." We disagree. As *Sanchez* made clear, the part of the expert's testimony that may be excluded on hearsay ground is that relating "*case-specific* facts about which the expert has no independent knowledge." (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) None of Rienhardt's statements falls in this category of impermissible testimony.

On direct examination, Rienhardt testified that, in his field, it is standard practice to identify pharmaceutical pills by visual inspection, whereby one compares markings found on the pills against a database of imprints that the Food and Drug Administration requires to be placed on tablets containing controlled substances. He then testified that he performed this visual inspection on the pills seized from defendant and formed the opinion that they contained alprazolam. Rienhardt's opinion, offered "while testifying at the hearing," was not hearsay. (See § 1200, subd. (a) [defining hearsay as "evidence of a statement that was made other than by a witness while

testifying at the hearing and that is offered to prove the truth of the matter stated"]; § 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact"].) Likewise, Rienhardt's testimony about the appearance of the seized pills was not hearsay, because Rienhardt personally examined the pills and saw the imprints on them. (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248 (*Iraheta*) ["Personal observations by any officer of Iraheta's or other subjects' tattoos, attire, companions, and location were not hearsay"]; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 413 (*Vega-Robles*) ["As we read *Sanchez*, it is not error for a gang expert to testify about case-specific facts about which he has personal knowledge"]; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174 (*Meraz*) [similar].) Accordingly, Rienhardt conveyed no hearsay on direct examination.

On the other hand, some of Rienhardt's testimony elicited on cross-examination constituted hearsay. In response to questioning by defense counsel, Rienhardt explained that the database he used "tell[s] you" that pills displaying a certain imprint "contain[] alprazolam, 2 milligrams." This information was hearsay but, crucially, not case specific.[2]

Rienhardt's statement concerning what the database "tell[s] you" related general background information relied upon

---

[2] Seizing on the fact that this testimony was elicited by the defense, the Attorney General argues that even if the testimony ran afoul of *Sanchez*, the defendant invited the error and cannot be heard now to complain. We need not reach this argument because, as explained *post*, Rienhardt did not relate case-specific hearsay, and, as such, there was no *Sanchez* error.

in the criminalist's field.  The facts disclosed by the database, and conveyed by Rienhardt, are "about what [any generic] pills containing certain chemicals look like."  (*Veamatahau, supra*, 24 Cal.App.5th at p. 75, fn. omitted.)  The database revealed nothing about "the particular events . . . in the case being tried," i.e., the particular pills that Sergeant Simmont seized from defendant.  (*Sanchez, supra*, 63 Cal.4th at p. 676.)  Any information about the specific pills seized from defendant came from Rienhardt's personal observation (that they contained the logos "GG32 — or 249") and his ultimate opinion (that they contained alprazolam), not from the database.  In short, information from the database is not case specific but is the kind of background information experts have traditionally been able to rely on and relate to the jury.  (See *Sanchez, supra*, 63 Cal.4th at pp. 685-686; *People v. Garton* (2018) 4 Cal.5th 485, 506-507; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1131; *People v. Espinoza* (2018) 23 Cal.App.5th 317, 321 (*Espinoza*); *People v. Blessett* (2018) 22 Cal.App.5th 903, 943; *Iraheta, supra*, 14 Cal.App.5th at p.1243; *Vega-Robles, supra*, 9 Cal.App.5th at p. 408; *Meraz, supra*, 6 Cal.App.5th at pp. 1174-1175.)

An example we gave in *Sanchez* illustrates this point.  In *Sanchez*, we said, "[t]hat an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph.  That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify.  The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang."

(*Sanchez, supra*, 63 Cal.4th at p. 677.)[3]  The example may be readily analogized to the case at hand.  Just as information that diamonds are a symbol of a certain gang is background knowledge, information that the designation "GG32 — or 249" engraved on pharmaceutical tablets indicates that the tablets contain alprazolam is "background information about which a[n] . . . expert could testify."  (*Ibid.*)  To be sure, street gangs and the symbols they use might or might not be the kind of information stored in a searchable database.  Yet the location of a piece of information cannot change its nature.  Simply because an expert obtained information from a database — instead of, say, a list of gang symbols maintained by a law enforcement

---

[3]      Defendant contends that the examples we used in *Sanchez* were mere "dicta."  He suggests that we disregard these examples, because, despite what we said, "[I]t is not at all clear that the gang's use of diamond tattoos can be defined as a non-case specific fact."  Defendant is mistaken.  We meant what we said in *Sanchez*, including what we said in this particular example:  the fact that a "diamond is a symbol adopted by a given street gang [is] background information."  (*Sanchez, supra*, 63 Cal.4th at p. 677.)  Hence, it is necessarily not case specific.  This is true regardless of whether the expert learned of the symbol, as defendant puts it, by consulting a specific database, talking to "a single gang member," or by "debrief[ing] seven members of the gang in question," "interview[ing] [an unspecific number of] rival gang members," and attending "gang seminars."

Of course, the type or number of sources that an expert relies on may affect the reliability of his testimony.  However, as the Attorney General points out, concerns about "reliability and accuracy" are "a separate issue from whether the material constituted case-specific hearsay."  We address defendant's arguments about reliability *post*.

agency — does not metamorphose that information from background knowledge into case-specific facts.

Defendant resists this conclusion, arguing that information obtained from a specific database cannot be background knowledge. According to defendant, background or general knowledge refers to "overall knowledge acquired from sources too numerous to distinguish and quantify." Because "[a]n expert's general background knowledge is the commingled result of experience and educational hearsay that is impracticable to disentangle," experts relating background knowledge "likely could not cite the specific textbook . . . or the particular lecture . . . from which they garnered their knowledge." Conversely, defendant argues, when experts name "specific sources consulted . . . for a particular case," they are not relating general knowledge but case-specific hearsay.

We reject defendant's crabbed view of expert knowledge. Defendant makes his assertion without any analysis of the relevant provisions of the Evidence Code or the longstanding common law on which they are based. (Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 801, pp. 25-26; *id.*, foll. § 802, pp. 142-143.) More to the point, we do not see how expert witnesses are doing something other than making use of their expertise when they rely on their "special knowledge, skill, experience, training, and education" to (1) select a source to consult, (2) digest the information from that source, (3) form an opinion about the reliability of the source based on their experience in the field, and (4) apply the information garnered from the source to the (independently established) facts of a particular case. (§§ 801, 802.) Without suggesting that this is (or needs to be) the process underlying every instance of expert testimony, we think that when experts

engage in such an inquiry, they are drawing upon their "special knowledge, skill, experience, training, and education" to form an opinion about the case. (*Ibid.*) Under our evidentiary law, experts may make such use of their knowledge— and may tell the jury that they did so. (§§ 801, 802.) In other words, it is not only when experts rely on the "amorphous" "commingled result of experience and education[]" (to quote defendant) that the testimony is considered as supplying general knowledge.

Again, the examples we used in *Sanchez* shed light on the matter. There we said that general background information encompasses the following: (1) in an automobile accident case, "that a given equation can be used to estimate speed based on [skid] marks"; (2) in a case involving suspected foul play, the "circumstances [that] might cause . . . hemorrhaging" in the eyes; and (3) in a personal injury case, the "potential long-term effects" of a serious head injury. (*Sanchez*, *supra*, 63 Cal.4th at p. 677.) Examining each of these types of information, we observe that the relevant equation and the fact that it can "be used to estimate speed" may be found in physics textbooks, circumstances causing hemorrhaging in medical treatises, and the long term effects of an injury in research papers. (*Ibid.*) As these examples make clear, an expert may consult specific sources in a case — a textbook, a treatise, or an academic paper — and supply the information found therein to the jury as background information without running afoul of the hearsay rules.

Subdivision (b) of section 721 reinforces this point. Section 721 sets forth the scope of cross-examination of expert witnesses. In pertinent part, it provides that "[i]f a witness testifying as an expert testifies in the form of an opinion," the witness may "be cross-examined in regard to the content or

tenor of any scientific, technical, or professional text, treatise, journal, or similar publication" so long as "[t]he witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinions." (§ 721, subd. (b).) Section 721 thus illuminates the kind of information that is admissible: an expert witness may "refer[] to, consider[], or rel[y] upon" "any scientific, technical, or professional text, treatise, journal, or similar publication" and may expect to be cross-examined "in regard to the content or tenor" of any such publication. (*Ibid.*) Accordingly, specific references and their "content or tenor" are not inadmissible merely because they are specific. (*Ibid.*)

Insofar as defendant argues that specific reference sources constitute background information only if the expert happened to know the information off-hand and did not review the source materials in preparing for a particular case, we reject the argument. It is untenable that the same information would be background knowledge when conveyed by one expert but case-specific information when provided by another solely because one of the experts consulted a resource containing that information before testifying. We cannot accept a framework under which the standard for admitting expert testimony would, as the Attorney General says, "turn on the expert's memory rather than on the reliability of the underlying material."

To reiterate, the relevant hearsay analysis under *Sanchez* is whether the expert is relating general or case-specific out-of-court statements. The focus of the inquiry is on the information conveyed by the expert's testimony, not how the expert came to learn of such information. Thus, regardless of whether an expert testified to certain facts based on composite knowledge "acquired from sources too numerous to distinguish and quantify" or if the expert simply looked up the facts in a specific

reference as part of his or her duties in a particular case, the facts remain the same. The background or case-specific character of the information does not change because of the source from which an expert acquired his or her knowledge.

Defendant also seeks to rely on *Stamps*, *supra*, 3 Cal.App.5th 988. In that case, the prosecution's expert had identified pills recovered from the defendant "as oxycodone and dihydrocodeinone based solely on a visual comparison of the seized pills to those displayed on the Ident-A-Drug Web site." (*Stamps*, *supra*, 3 Cal.App.5th at p. 991.) The Court of Appeal found that the expert's testimony was inadmissible hearsay because the "Ident-A-Drug content . . . was case specific." (*Id.* at p. 997.) The court explained its reasoning in succinct terms, stating, "We think it undeniable that the chemical composition of the pills Stamps possessed must be considered case specific. Indeed, the Ident-A-Drug hearsay was admitted as proof of the very gravamen of the crime with which she was charged. . . . That being true, our hearsay analysis is at an end." (*Ibid.*)

We are not persuaded.[4] Simply because the Ident-A-Drug web site served as the basis for the expert's ultimate opinion does not make information from the site case-specific. The expert's opinion that the seized pills were prescription opioids was not hearsay and not otherwise objectionable. (§ 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact"].) Information from the Ident-A-Drug database — that pills matching a certain description contain opioids — *was* hearsay but not case-specific.

---

[4] We disapprove of *People v. Stamps*, 3 Cal. App. 5th 988, to the extent it is inconsistent with our opinion.

It is no more case-specific than if an expert divulged the equation — into which she entered the length of the skid marks she measured at the scene of the accident — to come to the conclusion that a defendant was traveling at the speed of 100 miles per hour before the crash. (See *Sanchez, supra,* 63 Cal.4th at p. 677.)

Defendant further contends that the existence of other statutory exceptions to the hearsay rule — specifically Evidence Code section 1340 — "suggests that [] information included in a database is not part of the expert's general knowledge." Section 1340 provides that a statement "contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business." Because section 1340 arguably may cover Rienhardt's testimony regarding the database, defendant contends that the existence of the section means that the testimony cannot qualify as permissible testimony under sections 801 and 802.

As the Attorney General points out, however, "evidence is often admissible under more than one theory." Thus, the existence of one statutory provision allowing for admission of a piece of evidence does not preclude that evidence from being admitted under a different provision. (See, e.g., Cal. Law Revision Com. com., 29B pt. 5 West's Ann. Evid. Code (2015 ed.) foll. § 1280, p. 48 ["The evidence that is admissible under this section is also admissible under Section 1271, the business records exception"]; *People v. Clark* (2016) 63 Cal.4th 522, 563 ["defendant presupposes that the only basis for admitting any of Yancey's statements was through Evidence Code section 1223, the coconspirator hearsay exception. But defendant fails to appreciate the point . . . that many, if not most, of Yancey's

17

statements were also admissible as nonhearsay."]; *People v. Karis* (1988) 46 Cal.3d 612, 635, italics added ["The ruling [to admit testimony] must be upheld if the evidence was admissible under *any* hearsay exception"]; *People v. Nelson* (2012) 209 Cal.App.4th 698, 710, fn. omitted [" 'Hospital . . . records . . . fall within the umbrella of the business record exception [of section 1271].' [Citations.] [Such] records may also qualify as public records under section 1280"].) In this case, we are not persuaded that the existence of section 1340 bars Rienhardt's statements from being admitted under sections 801 and 802.[5]

Finally, defendant cites policy reasons for treating sources "consulted by an expert as case-specific hearsay rather than as general background knowledge." Defendant asserts that only if "the consulted sources are . . . treated as [case-specific] hearsay," would "the trial court . . . be able to vet the reliability of the sources before the hearsay is presented to the jury." If the information is instead considered a "part of the expert's general knowledge," the vetting process would be "undercut" because the expert would be permitted to "essentially vouch for the reliability of a source."

Defendant's argument paints a false dichotomy. In fact, in law, and in practice, testimony admitted under sections 801

---

[5]   Because we find that Rienhardt did not relate inadmissible case-specific hearsay, we do not reach the argument concerning whether the testimony would also have been admissible under section 1340. We thus take no position on cases that have weighed in on this issue. (See *People v. Mooring* (2017) 15 Cal.App.5th 928, 941 ["We conclude the Ident-A-Drug Web site comes within the published compilation exception to the hearsay rule codified in Evidence Code section 1340"]; *Espinoza, supra,* 23 Cal.App.5th at p. 321 [same].)

or 802 of the Evidence Code is subject to scrutiny on reliability grounds by the court and opposing counsel. Section 801 specifies that the "matter" on which an expert relies must be "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (§ 801, subd. (b).) Thus, an expert must establish that the basis for his or her opinion is sufficiently reliable such that it "reasonably may be relied upon" by experts testifying on the same subject. (See Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code, *supra*, foll. § 801, p. 26 [stating that this requirement "assures the reliability and trustworthiness of the information used by experts in forming their opinions"]; *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*) ["Comments of a commission that proposed a statute are entitled to substantial weight in construing the statute"].) Rienhardt satisfied this requirement by averring that his use of the database was "the generally accepted method of testing for this kind of substance in the scientific community."

Defendant could have objected to or otherwise challenged this assertion. (See § 721, subd. (a).) Had he done so, he could have subjected the testimony to the trial court's critical examination. Pursuant to section 802, "[t]he court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based." Furthermore, "[t]he court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion." (§ 803; see also § 402, subd. (b) [providing a procedure to determine "the question of the admissibility of evidence out of the presence or hearing of the jury"].) In short, regardless of whether an expert's testimony is

19

treated as supplying general information or case-specific facts, the courts are fully empowered to "vet the reliability of the sources" underpinning that testimony. (See *Sargon, supra,* 55 Cal.4th at pp. 770-772.)

Defendant glosses over the court's gatekeeping power. Instead, he asserts that the reliability of "reference materials consulted by the expert for a particular case . . . cannot be tested" and, therefore, testimony relying on such materials "cannot fall within the background knowledge exception." To build his case, defendant constructs what he calls the "surrogate problem." According to defendant, when an expert consults a reference guide, "the expert witness is not actually the expert providing the expertise." "Rather, the expert [witness] is acting as a surrogate conveying the expertise of someone else — the author of the reference source." As such, there can be no "assurance of the reliability" of the surrogate statement.

We disagree. Simply because an expert is relying on information supplied by "someone else" does not mean the trustworthiness of that information cannot be explored through examination. Most directly, that "someone else" "may be called and examined" by the defendant if he so chooses. (§ 804, subd. (a) ["If a witness testifying as an expert testifies that his opinion is based in whole or in part upon the opinion or statement of another person, such other person may be called and examined by any adverse party as if under cross-examination concerning the opinion or statement"]; see also *id.,* subd. (d) ["An expert opinion otherwise admissible is not made inadmissible by this section because it is based on the opinion or statement of a person who is unavailable for examination pursuant to this section"].) More indirectly, an expert may be examined regarding her belief about the reliability of the information upon

which she bases her opinion. If the expert professes to know little about the source material or cannot explain why it is a credible fount on which to rest the proffered testimony, that would be a basis for the party opponent to discredit the testimony (via cross-examination or by offering its own expert) or for the trial court to exclude it.

Reliability probes are also not the only tool a trial court has to exclude improper expert testimony. Should an expert attempt to take the stand and do nothing more than regurgitate information from another source without applying any of his or her own expertise, as defendant claims a "surrogate" expert may do, the court need not stand idly by. Instead, the court may subject the expert to a hearing, outside the presence of the jury, to preview his or her testimony. (See § 402.) During the hearing, the court may probe the expert's qualifications. Under section 720, "[a] person is qualified to testify as an expert" only if he or she "has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (§ 720, subd. (a).) Accordingly, if an expert is merely parroting hearsay information without understanding the information or otherwise providing explanation to "assist the trier of fact," the so-called expert can be prohibited from testifying altogether. (§ 801, subd. (a); accord *Williams v. Illinois* (2012) 567 U.S. 50, 80 (plur. opn.) ["trial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue' "]; *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 862 ["There is a point . . . at which an expert's opinion that is based entirely upon or

substantially upon other opinions would conceivably be worthless. This would occur when, in effect, the expert begins to stray outside his or her subject area of expertise."].)

In addition, the court has authority under section 352 to impose reasonable limits on an expert's testimony. (See, e.g., *People v. Richardson* (2008) 43 Cal.4th 959, 1008 [noting that the trial court's authority under section 352 "extends to the admission or exclusion of expert testimony"].) If the court believes an expert is unduly consuming time, improperly seeking to impress the jury with someone else's expertise, or otherwise "creat[ing] substantial danger of . . . confusing the issues, or of misleading the jury," the court may curtail an expert's testimony — for instance, by limiting how much of a hearsay source an expert can relate to the factfinder. (§ 352.)

Defendant in this case did not avail himself of any of these protections offered by the Evidence Code, choosing instead to rely on his closing statements to cast doubt on the reliability of the drug identification procedure.[6]  Yet simply because

---

[6]  Defendant did request that the trial court instruct the jury with CALCRIM 332 concerning expert witness testimony, and the court did so. Accordingly, the court told the jury: "You must consider the opinions, but you are not required to accept them as true or correct. . . . You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." The jury was thus informed that it may disregard Rienhardt's opinion if it found the opinion unreliable.

As the above makes clear, it is the jury's role to decide the weight to accord to the expert testimony and "courts must . . . be cautious in excluding expert testimony" so as not to usurp that

defendant did not test Rienhardt's testimony — offering no voir dire of the expert, no probing question about the acceptability of his methodology, and no cross-examination regarding the reliability of the database itself — does not mean the mechanism to do so is absent.

In short, the asserted "surrogate problem" offers no reason for us to treat general knowledge as anything but what it is. In the context of cases such as this one, if no chemical testing has been performed, the defense can poke holes in the prosecution's case on that basis and argue reliability, or lack thereof, to the jury, as happened here. What the defense cannot do is claim that the expert's testimony concerning the identification procedure he followed in lieu of chemical testing should be excluded on hearsay grounds merely because the defense did not scrutinize the reliability of said procedure.

For these reasons, we reject defendant's arguments. Consistent with our statutory rules of evidence and case law, we hold that Rienhardt related no inadmissible case-specific hearsay in testifying to the contents of a drug identification database.

## B. Whether Substantial Evidence Supports Defendant's Conviction

Independent of the admissibility of Rienhardt's testimony, defendant claims the trial court erred in denying his motion for

---

role. (*Sargon, supra,* 55 Cal.4th at p. 772.) Although " '[t]here is no bright line that divides evidence worthy of consideration by a jury . . . from evidence that is not,' " many of defendant's arguments concerning reliability may be better understood as directed at the weight of the expert testimony, not its admissibility. (*Id.* at p. 769.)

acquittal pursuant to Penal Code section 1118.1. (See Pen. Code, § 1118.1 ["In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged . . . if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal"].)

We review the denial of a section 1118.1 motion using the same standard "employed in reviewing the sufficiency of the evidence to support a conviction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).) We thus examine " 'the entire record in the light most favorable to the judgment' " to determine whether it discloses substantial evidence — " 'evidence that is reasonable, credible, and of solid value' " — " 'from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 278 (*Gomez*).) Our review " ' "presume[s] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' [Citation.] Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' " (*Ibid.*) Instead, we ask whether there is " ' "substantial evidence of the existence of each element of the offense charged" ' " such that any rational jury may have convicted defendant. (*Id.* at p. 307.)

In this case, defendant contests only one element of the misdemeanor possession charge: that the pills he possessed actually contained the controlled substance alprazolam. We

have concluded that Rienhardt was properly allowed to give his opinion to that effect. In addition, our case law is clear that the element may be established by circumstantial evidence — that is, by evidence other than direct, chemical testing. (*People v. Francis* (1969) 71 Cal.2d 66, 72 ["the narcotic character of a substance may, of course, be proved by circumstantial evidence"]; *People v. Palaschak* (1995) 9 Cal.4th 1236, 1242 (*Palaschak*) [similar]; *People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369 (*Sonleitner*) [similar]; *People v. Galfund* (1968) 267 Cal.App.2d 317, 320 [similar].)[7]

We agree with the Court of Appeal that substantial circumstantial evidence supports defendant's conviction. In addition to Rienhardt's testimony, the jury heard Sergeant Simmont's identification of the pills. The sergeant made this identification twice, once at trial when he referred to the pills by

_____

[7] The federal courts are of the same view. (See *United States v. Walters* (1st Cir. 1990) 904 F.2d 765, 770 ["Proof based on scientific analysis or expert testimony is not required to prove the illicit nature of a substance"]; *United States v. Agueci* (2d Cir. 1962) 310 F.2d 817, 828; *Griffin v. Spratt* (3d Cir. 1992) 969 F.2d 16, 22; *United States v. Dolan* (4th Cir. 1976) 544 F.2d 1219, 1221; *United States v. Osgood* (5th Cir. 1986) 794 F.2d 1087, 1095; *United States v. Schrock* (6th Cir. 1988) 855 F.2d 327, 334; *United States v. Coleman* (7th Cir. 1999) 179 F.3d 1056, 1060; *United States v. Westbrook* (8th Cir. 1990) 896 F.2d 330, 336; *United States v. Durham* (9th Cir. 2006) 464 F.3d 976, 984; *United States v. Sanchez De Fundora* (10th Cir. 1990) 893 F.2d 1173, 1175; *United States v. Harrell* (11th Cir. 1984) 737 F.2d 971, 978; *Vest v. United States* (D.C. 2006) 905 A.2d 263, 267; see also *Jones v. Commonwealth* (Ky. 2011) 331 S.W.3d 249, 253 ["courts around the nation have uniformly held that circumstantial evidence is enough to sustain a conviction for an offense involving a controlled substance"]; *State v. Harris* (La. 2003) 846 So.2d 709, 713 [similar].)

the brand name of Xanax and once during the interrogation when he referred to them as Xanibars. Sergeant Simmont is an experienced police officer, with experience in narcotics investigation, and a rational jury could credit his testimony that defendant possessed Xanax, or more formally, alprazolam. (See *People v. Bailey* (1991) 1 Cal.App.4th 459, 462-463 (*Bailey*) [concluding that a trained narcotics officer's "testimony establishes that the substance in question was cocaine base"]; *Sonleitner*, *supra*, 183 Cal.App.3d at pp. 369-370 ["the nature of a substance . . . may be proved . . . by the expert opinion of the arresting officer"]; *People v. Marinos* (1968) 260 Cal.App.2d 735, 738-739 ["In the case at bench the officer who testified had had many years of experience in the business, his testimony was not objected to, he said that in his opinion the cigarette smoked by appellant contained marijuana. . . . [¶] We cannot say as a matter of law that there was not substantial evidence to support the finding that appellant possessed marijuana"]; *State v. Carter* (La.Ct.App. 2008) 981 So.2d 734, 744-745 (*Carter*) [discerning sufficient evidence "from which the jury could find beyond a reasonable doubt that the pills at issue were identified as hydrocodone" when, along with a criminalist's testimony, a detective testified "that he had seen similar pills in the past as part of his job and that the pills at issue were hydrocodone pills"].)

The jury also heard defendant's admission. When questioned about the "the pills that [he] had, the bars[,] the Xanibars," defendant said, "I take those." Defendant admitted that he had taken "a lot" of the pills and that they helped him "feel good." Defendant's own statements constituted " 'reasonable, credible, and of solid value' " evidence that the pills are "Xanibars," or the controlled substance alprazolam.

(*Gomez, supra*, 6 Cal.5th at p. 278; see *Palaschak, supra*, 9 Cal.4th at p. 1242 [crediting as part of the evidence against the defendant the fact that "[o]n being arrested, defendant readily admitted ingesting the drug [LSD]"]; *People v. Williams* (1971) 5 Cal.3d 211, 216 ["knowledge of the character of dangerous drugs or narcotics may be shown by acts or declarations of the accused"].)

Defendant protests that this evidence shows only that defendant "believed he possessed 'Xanibar.'" This is insubstantial, according to defendant, because "[t]here was no testimony that Xanibar and Xanax are synonymous." But on review of a sufficiency of the evidence claim, we draw every reasonable inference in support of the verdict. (E.g., *Houston, supra*, 54 Cal.4th at p. 1215.) In light of Sergeant Simmont's use of the term "Xanibars" and "Xanax" to refer to the same pills, a rational jury could have drawn the inference that both are names for the controlled substance alprazolam. Defendant further argues that he may have been mistaken in his belief that he had been taking alprazolam, because "counterfeit drugs are typically sold on the street to unsuspecting users who believe they are real." Although that might have been possible, such an argument "simply present[s] one interpretation of the evidence";[8] it does not suggest that a reasonable jury could not "draw the opposite inference from the evidence." (*Gomez, supra*, 6 Cal.5th at p. 308.) Put differently, a reasonable jury was not

---

[8] As discussed further *post*, defendant did not urge such an interpretation at trial. Defendant never mentioned "counterfeit drugs," the typicality or frequency at which they are "sold on the street," the ubiquity of "unsuspecting users who believe they are real," or otherwise attempted to negate his adoptive admission before the jury.

precluded from taking defendant's candid confession at face value — that defendant acquired what he identified as alprazolam, took it, and felt good because the drug was indeed alprazolam. In sum, defendant's own statement — along with the testimony of an experienced police officer and a criminalist — provides substantial evidence that defendant possessed the controlled substance alprazolam.

In contesting the above, defendant draws our attention to an out-of-jurisdiction case, *State v. Ward* (2010) 364 N.C. 133 [694 S.E.2d 738]. The court in *Ward* held that, under North Carolina's evidentiary rules, expert testimony relying solely on visual inspection for drug identification is insufficiently reliable to be admitted. (*Id.* at p. 739.) *Ward* is accordingly a case about reliability, not sufficiency of the evidence. As defendant never challenged Rienhardt's testimony on reliability grounds under sections 801 or 802 of the California Evidence Code, *Ward* is inapposite to the matter at hand.

Although he attempts to rely on *Ward*, defendant concedes that he does not "claim that chemical analysis is required in every case." When a chemical analysis is not offered, however, defendant asserts that "because of the prevalence of counterfeit drugs on the street that do not contain active ingredients," "there must be some additional circumstantial evidence in the record that a particular pill is legitimate." According to defendant, had the pills been "found in a prescription bottle or in a container bearing information about the producer," then perhaps "a visual identification [would have been] sufficient." But because the pills were found wrapped in cellophane, defendant suggests that chemical testing was needed. Yet, it is unclear why a prescription bottle — which may be as easily counterfeited as the drugs themselves — should serve as

sufficient "additional circumstantial evidence" when defendant's admission that the pills were "Xanibars" and made him feel good does not. Because both circumstances tend to make it less likely that the pills were "counterfeit drugs . . . that do not contain active ingredients," we reject defendant's attempt to draw a rigid distinction between the two.

Finally, defendant faults Rienhardt for not ruling out the possibility of counterfeits by testifying, for example, "that the pills had distinguishing characteristics that differentiated them from counterfeit pills." On direct examination, Rienhardt stated his opinion that the pills contained alprazolam and the basis for his opinion. He was not required at that point to anticipate and address possible challenges to the basis of his opinion. In other words, it was incumbent on defendant to elicit from Rienhardt whether "the pills had distinguishing characteristics that differentiated them from counterfeit pills" if he wished the jury to draw the conclusion that the drugs were counterfeits. This defendant did not do.

Indeed, defendant did not argue a counterfeit theory at trial. He did not question either Sergeant Simmont's testimony or cast doubt on his own admission that he took "the pills . . . , the bars[,] the Xanibars." At most, he suggested to Rienhardt that the pills "could be something else," and Rienhardt responded with a reason why he did not think the pills were other than what they appeared to be. Despite Rienhardt's response, defendant never followed up by mentioning counterfeits, "the prevalence of counterfeit drugs on the street," or even that the pills may have been purchased on the street. On this record, the jury evidently rejected the inference that the pills were something other than what they appeared to be, and we cannot say as a matter of law this was unreasonable. (Accord

*Vest v. United States* (D.C. 2006) 905 A.2d 263, 267-268 ["Appellant's argument might be more persuasive if there had been some evidence that the substance sold . . . was not, in fact, what it was purported to be.  Here, there is not even a hint [of] that"]; *Espinoza, supra,* 23 Cal.App.5th at p. 323; *Bailey, supra,* Cal.App.4th at pp. 464-465 ["The reality of this case is the issue raised on appeal concerning whether this was base cocaine was not even the focus of dispute in the trial court"]; contra *People v. Wright* (2016) 4 Cal.App.5th 537, 541-544, 547 [reversing a judgment for lack of substantial evidence when an expert's testimony was the only evidence supporting the judgment and the analytical gap between the material the expert relied upon and the conclusion he drew was an issue heavily litigated at trial].)

In sum, having found that the trial court did not err in admitting the criminalist's testimony, we further find that his testimony and other circumstantial evidence support defendant's conviction.

### III. DISPOSITION

For the reasons discussed herein, we affirm the judgment of the Court of Appeal.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Veamatahau
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 24 Cal.App.5th 68
**Rehearing Granted**


_____

**Opinion No.** S249872
**Date Filed:** February 27, 2020
_____

**Court:** Superior
**County:** San Mateo
**Judge:** Barbara J. Mallach


_____

**Counsel:**

Cynthia M. Jones, under appointment by the Supreme Court, for Defendant and Appellant.

Mary K. McComb, State Public Defender, Barry P. Helft, Chief Deputy State Public Defender, and William Whaley, Deputy State Public Defender, for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Laurence K. Sullivan, Donna M. Provenzano, Eric D. Share and Huy T. Luong, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cynthia M. Jones
19363 Willamette Dr., #194
West Linn, OR 97068
(858) 793-9800

Donna M. Provenzano
Supervising Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3844