Filed 4/3/24  P. v. Schwartz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079940 |
| v. | (Super.Ct.No. FSB047468) |
| ROBERT DEANE SCHWARTZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed.

Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Evan Stele, Deputy Attorney Generals, for Plaintiff and Respondent.

1

Defendant petitioned the trial court to recall his 26-year-to-life sentence pursuant to Propositions 47 (Pen. Code, § 1170.18) and 36 (Pen. Code, § 1170.126, subd. (f)).[1] The trial court found defendant would pose an unreasonable risk of danger to public safety if resentenced and denied defendant's petitions. (§§ 1170.18, subd. (b), 1170.126, subd. (f).) Defendant contends the trial court erred by finding he poses an unreasonable risk of danger to public safety. We affirm.

## FACTS

Defendant was born in November 1953; he is currently 70 years old.

A.      DEFENDANT'S CRIMES

1.      *ASSAULT*

In December 1989, defendant "brandished a .22 caliber rifle" at four people and then chased the group in his car. Deputies conducted a traffic stop and advised defendant to raise his hands. Defendant "refused to comply and started walking towards [the deputies], waving his hands wildly." When the deputies tried to arrest defendant, defendant kicked both deputies, shoved one of the deputies, and continued struggling while in handcuffs. Defendant was convicted "for resisting arrest and assault with a deadly weapon, along with assault on a police officer." Defendant was granted 36 months of probation with the condition he serve 180 days in jail.

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

## 2. *ATTEMPTED VOLUNTARY MANSLAUGHTER*

In December 1991, San Bernardino Police Officers Johnson and Garcia were on patrol when they were dispatched to a domestic violence call at defendant's apartment. It was alleged that defendant was the aggressor and had access to firearms. The officers entered the apartment and asked defendant to step outside, but defendant refused. Defendant said to the officers, " 'You are the only mother fuckers that are leaving.' " Defendant pointed "a fully automatic AK 47" at the officers. As the officers turned and ran out of the apartment, defendant fired the AK-47, which produced "a fully automatic burst" of ammunition. Defendant shot both officers. Officer Johnson was shot in his hip and the bullet traveled to his abdomen. Officer Garcia was shot in his arm. The officers took cover on the ground behind a set of stairs. Officer Johnson heard more bursts of gunfire, which were fired out of defendant's apartment door.

After approximately 45 seconds, defendant exited the apartment and said he wanted to surrender. However, defendant did not comply with the officers' directives to raise his hands and lie down. Instead, defendant walked toward the officers with his hands at his sides. When defendant was within 10 feet of Officer Johnson, Officer Johnson shot defendant. Defendant did not respond. Officer Johnson shot defendant a second time, and defendant flinched. Officer Garcia shot defendant, and defendant fell to the ground.

In March 1992, during a psychological evaluation, defendant "admitted that he '[a]mused himself' by shooting at the officers. [Defendant] laughed and never expressed any type of remorse.' " The psychologist diagnosed defendant with an

antisocial personality disorder. In October 1994, following a jury trial, defendant was convicted of two counts of attempted voluntary manslaughter. (§§ 664, 192, subd. (a).) Defendant was sentenced to prison for a term of 14 years, six months. However, by 1999, defendant was on parole.

### 3.    *POSSESSION OF A CONTROLLED SUBSTANCE*

On October 8, 2004, police officers were dispatched in response to a call of people dealing drugs in front of a residence. When officers arrived, they found defendant was "in possession of two glass 'crack' pipes and 2 bags containing approximately 7.3 grams of methamphetamine." In 2008, a jury found "defendant guilty of Possession of a Controlled Substance; along with finding two prior serious or violent convictions true pursuant to the 'three strike' law and the enhancements of Committing a Felony While on Bail or Own Recognizance,[2] and a Prior Prison Term." The trial court sentenced defendant to prison for an indeterminate term of 26 years to life. Defendant's three strikes were the two voluntary manslaughter convictions and the conviction for drug possession.

### B.    DEFENDANT'S GUNS

"[Defendant] is knowledgeable about weapons and their capabilities." In the early 1990s, "defendant had an affinity for guns. [Defendant] carried a .25 caliber Raven semi-automatic weapon with him at all times, because 'Rialto police officers kept messing with [him].' "

---

[2] In 2004, defendant was arrested for driving under the influence; we infer defendant was on bail due to that arrest.

In October 1991, a woman told defendant about an armed robbery she witnessed the prior night at a fast-food restaurant. "[Defendant] then took out a gun from the top drawer of the file cabinet in his office. He held the gun to [the woman's] head and asked, 'Like this?,' and then just laughed."

At an unidentified time, likely around the early 1990s, when defendant's wife was eight months pregnant, "defendant pointed a gun at her and told her it was not loaded. He then pulled the trigger and nearly shot her when it turned out that it was, in fact, loaded. Further, when [defendant's] daughter was four to five months old, he pointed a gun at her head and said, 'How would you like me to kill your baby for you, bitch?' [Defendant] then told [his wife] that the gun was on 'safe' and then pointed the gun at her instead. When he pulled the trigger, a bullet went past her and over her shoulder into the wall behind her."

At an unidentified time, prior to 2016, defendant "had a federal firearms dealing license . . . . [He] went on a buying trip," and was stopped for speeding. Defendant had a loaded gun in the car and an open container of beer. In 2016, defendant reported that he "owns ma[n]y weapons and keeps his weapons loaded."

C.   DEFENDANT'S SUBSTANCE ABUSE

Defendant began drinking alcohol as a toddler. Defendant recalled " 'sneaking mixed drinks of whiskey and soda when [he] was 3 or 4 years old." Defendant drank sips of alcohol at family gatherings and began drinking alcohol regularly at age 16. Defendant has been arrested four times for driving while intoxicated and "has had ten or fifteen arrests for being drunk in public."

5

Defendant asserted he was drunk when he shot the two police officers in 1991. "Defendant stated he had been drinking a great deal since he woke up that morning. He stated he began his day with three or four beers in the morning and explained he needs the beers in the morning 'Cause if I don't drink a few beers I get nauseous.' As the day progressed he stopped to purchase a 12-pack of beer and consumed some of the beers. He later stopped at a friend's house and drank eight or nine more beers. . . . After leaving his friend's home be stated he stopped 'at a couple bars' where he had one beer at each bar; this was all before 4pm. On his way home he 'purchased a couple more cases of beer' and then consumed at least most of a case of beer." In 1991, defendant "was consuming a case of beer a day." At that time, if defendant were to "get drunk about a hundred times, he[ would] black out about half of those times."

In July 2005, defendant had "pruno" in his cell. A corrections officer noticed, and defendant "immediately grabbed his cup and began drinking and continued to drink even when told to stop." In November 2005, defendant was disciplined for possessing " 'Home Brew' " in his cell. In December 2005, defendant was disciplined for possessing Home Brew, which was identified as Pruno. Defendant attended alcoholics anonymous meetings for a period of time in prison, but then quit the program.

In 2016, Defendant was evaluated by a psychologist, Robert E. Brodie II, Ph.D. (Dr. Brodie). Defendant told Dr. Brodie, " 'I was having a problem quitting drinking. I had been trying to quit drinking for a while, and it just wasn't developing the way I wanted it to.' " Dr. Brodie opined "that [defendant] has an alcohol abuse problem and has no insight into this problem." Dr. Brodie concluded, "[Defendant] does not believe

6

that he has a problem with drug or alcohol use and does not believe he is in need of any form of treatment."

D.     <u>DEFENDANT'S VIEWS OF THE POLICE</u>

In 2016, when speaking with Dr. Brodie, defendant said, " 'I had a lot of run ins with the police. I would be drinking a lot. The police would come out and we would get into [it]. And I would end up with a drunk in public plus a resisting arrest.' " Defendant asserted he was arrested for being drunk in public because the police "don't need any alcohol tests or proof. The drunk in public was just a catch all for when [defendant] had a disagreement [with the law]." Defendant compared his experiences with the police to his childhood bullies and "reiterated how he feels he should deal with bullies by force." Defendant told Dr. Brodie, "America's not a free state. It [is] a police state occupation force."

In documents written prior to May 2016, defendant "frequently makes statements referring to the Inland Empire and the court system as the 'Inland Empire of Satan where citizens are offered up as human sacrifices to the false God of the Police State Oligarchy at their Temple of Iniquity, the courthouse." When Dr. Brodie asked defendant to explain what the foregoing quoted sentence meant, defendant responded, " 'That's how they are running shit. Like a police state occupation. You've got the law and compared with the facts of what happened. And they just do what they want in San Bernardino. Fuck it. I used to be in the lord.' [Defendant] then made reference to the disciples being tortured and added, 'They did Jesus just like that.' He was asked to again explain the statement and he said he was making reference to the Bible and the

7

Declaration of Independence and stated, 'I don't feel the government is following any of it. They got Mother Theresa getting up there and that's Garcia. If I wanted to they would be dead, and all the rest that showed up. I fired off to the side to scare them in what I felt was accordance of the law."

E.    PETITION

Defendant petitioned the trial court to resentence him "under the Three Strikes Reform Act of 2012" (Proposition 36). (§ 1170.126.) Later, "[defendant] requested that his petition previously filed under Proposition 36 also be deemed to seek relief under Proposition 47. The prosecution did not oppose the request, and it was granted." The parties agreed upon defendant's eligibility for relief under Propositions 36 and 47. However, the People asserted "that [defendant] presented an 'unreasonable risk of danger to the public' and that his Petitions pursuant to Penal Code Section[s] 1170.18 and 1170.126 should be denied."

**DISCUSSION**

Defendant contends the trial court erred by finding he poses an unreasonable risk of danger to public safety. (§§ 1170.18, subd. (b) & 1170.126, subd. (f).)

Proposition 36 changed the "Three Strikes" Law to require that, for a third-strike sentence, the third strike be a serious or violent felony. (*People v. Valencia* (2017) 3 Cal.5th 347, 353-354 (*Valencia*).) Defendant's third-strike conviction for drug possession conviction is not a serious or violent felony. (§ 1170.126, subd. (b).) Therefore, defendant qualified for resentencing "unless the [trial] court, in its discretion,

determine[d] that resentencing [defendant] would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).)

"Proposition 47 reclassified as misdemeanors certain drug- and theft-related offenses that previously were felonies or wobblers." (*Valencia*, *supra*, 3 Cal.5th at p. 355.) In particular, Proposition 47 changed defendant's third-strike drug-possession offense (Health & Saf. Code, § 11377) from a felony to a misdemeanor. (Pen. Code, § 1170.18, subd. (a).) That meant defendant could petition the trial court to recall defendant's indeterminate third-strike sentence. (Pen. Code, § 1170.18, subds. (a) & (b).) The trial court could deny defendant's petition if "in its discretion, [it] determine[d] that resentencing [defendant] would pose an unreasonable risk of danger to public safety" (Pen. Code, § 1170.18, subd. (a)), which "means an unreasonable risk that the petitioner will commit a new violent felony" as defined in section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c); see also *Valencia*, at pp. 355-356.) The felonies in that subdivision include homicide, attempted homicide, and assault with a machine gun on a peace officer. (§ 667, subds. (e)(2)(C)(iv)(IV) & (VI).)

It was the People's burden to prove dangerousness by a preponderance of the evidence. (*People v. Frierson* (2017) 4 Cal.5th 225, 239.) In reviewing the record, we apply the substantial evidence standard of review to the facts supporting the trial court's factual findings, and we apply the abuse of discretion standard of review to the trial court's ultimate determination that, if resentenced, defendant poses an unreasonable risk of danger to the public. (*People v. Buford* (2016) 4 Cal.App.5th 886, 901.)

9

Defendant is an alcoholic who has had little treatment for his alcoholism. Defendant drives drunk. Defendant believes that the police are bullying him when they question him. Defendant's collection of guns includes an AK-47, and he has used that automatic weapon to shoot two police officers who questioned him.

The foregoing evidence indicates there is a high likelihood that, if defendant were given a lesser sentence and released, then he would become intoxicated, drive, interact with police who stop him, and either shoot the officers or assault the officers with a machine gun. Therefore, the evidence supports the finding that, if he were resentenced, defendant would pose an unreasonable risk of committing a new violent felony, in particular homicide, attempted homicide, or assault with a machine gun upon a peace officer.

Defendant asserts he does not pose an unreasonable risk of danger because he "was never charged with or suspected of being a felon in possession of a firearm. There is also nothing to indicate he would unlawfully possess a firearm if released today." Defendant carried a gun on him at all times and kept his guns loaded. As noted in a probation report, "[D]efendant has a long history of pulling weapons on different individuals, including his own wife and infant daughter." Given defendant's affinity for firearms and long history of using firearms, one can reasonably infer that defendant will procure a firearm upon his release from incarceration.

Defendant asserts he does not pose a danger because he "has not committed a subsequent violent offense in over thirty years." The violence we are focused upon involved firearms. We agree that defendant did not have a firearm while incarcerated,

10

but if defendant were released, then he is likely to once again obtain a firearm given his affinity for firearms, and once again shoot at people.

Defendant notes that, at one point in his incarceration, a modified razor blade was found in his cell, but he did not use it. The razor blade was found on the floor of the cell, outside of its plastic casing. It is unclear how long the razor blade had been in the cell or if it belonged to defendant because two inmates occupied the cell. "When asked who the razor belonged to [defendant] replied, 'I'll take the blame because I have less time to lose.' " If the razor belonged to defendant and he had it for a considerable period of time without using it, that does not persuade us that he is less likely to shoot a person. Attacking a person with a razor blade requires far more physical effort than shooting a person with a machine gun. Defendant's history reflects he is quick to brandish firearms and shoot people.

Defendant contends it "is his good right" to distrust the police, and that distrust is not evidence of dangerousness because defendant "abides by" the law. Defendant assaulted a group of four people with a rifle and shot two police officers with an AK-47. Accordingly, defendant does not always abide by the law when handling firearms. Further, defendant carried a gun "on his person at all times because [he believed] officers in Rialto were 'harassing him.' " Because defendant carried a gun to use against the police, his distrust of the police is dangerous.

Defendant asserts that his prior struggles with alcohol addiction are "not evidence that he still suffers from 'unresolved issues with addiction.' " Defendant notes that the last time he was found with contraband medication was in 2007. Defendant

takes prescription pain medications for his health conditions. In 2013, when a doctor withheld defendant's pain medication, defendant wrote a note and submitted it in the medical request box. The note read, " 'Fuck Dr. Ko that asshole should be fired, or fired up,' 'withholding my pain meds worse than cheap-ass jewish n*****s' and 'If you're trying to provoke violence, you're on the right path.' " When asked what " 'fired up' " meant, defendant "replied, 'to get beat up.' " One can infer from this evidence that defendant's addiction migrated to pain pills because defendant threatened violence against the doctor who withheld his pain pills.

In Dr. Brodie's report, he wrote, "It is acknowledged that there is no evidence to indicate that [defendant] is using any substance presently however he is also not receiving any random drug and alcohol screens to indicate that he is not using. [Defendant's] substance use began when he was 3 or 4 years old and he has abused substances regularly throughout his adult life. His controlling offense was a substance related conviction. While incarcerated he has been disciplined three times on substance related infractions. His parole has been violated three times as a result of alcohol use. [Defendant] has no insight into his substance use and does not recognize that he has a substance abuse problem. He has only participated in substance abuse treatment on a limited basis. . . . He has never completed a substance abuse treatment program and quit attending NA and AA while in prison. He is not currently attending any substance abuse treatment."

Defendant's lifelong addiction to alcohol and drugs, along with his lack of treatment for that addiction, indicate that, if he is currently sober, then he is likely to

12

relapse if released from incarceration. In other words, the evidence supports a finding that defendant has not overcome his addiction issues.[3]

Defendant contends that he does not pose an unreasonable risk of danger because he "demonstrate[ed] insight into the shooting by acknowledging that he—and no one else—was responsible for injuring the officers." When speaking with Dr. Brodie in 2016, defendant said he shot at the officers because he heard the officers "use[] the code word." Defendant knew the "code word" and knew "what it means." Defendant did not identify the "code word." Defendant explained his thoughts after hearing the codeword: "So the AK is right there and I'm thinking well we'll see how much fun it's going to be. I had about enough of their shit." Defendant's explanation of shooting the officers indicates a belief that the officers were conspiring against him by using code. That evidence further demonstrates the danger defendant presents if released because defendant appears to view police officers as conspiring against him.

Defendant contends he is not a danger because he has learned that one must follow the commands of law enforcement. Defendant is addicted to intoxicating substances. While defendant might follow commands when sober, he has a history of failing to follow commands when intoxicated. Given defendant's addictions, we are not persuaded that defendant is likely to act rationally if confronted by police.

---

[3] In May 2015, defendant was evaluated by a different psychiatrist, David M. Walsh, PsyD. Dr. Walsh opined that defendant's "substance abuse is in remission." Dr. Brodie expressly disagreed with Walsh's opinion. Under the substantial evidence standard, we view the evidence in the light most favorable to the ruling and resolve conflicts in favor of the ruling. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35-36.) Accordingly, we rely on Dr. Brodie's opinion.

Defendant contends that he has "demonstrate[d] remorse for the shooting." When Dr. Brodie asked defendant why defendant felt bad about shooting the two officers, defendant explained that defendant and his wife "had brand new stuff," "were going out to dinner, eating three nights a week," "had good clothes," "had three cars and a truck," and defendant lost those material things by shooting the two officers. "[Defendant] never discussed the impact of shooting the officers and having an effect on their physical health and potentially ending their lives." Dr. Brodie opined, "[Defendant] has no insight into his behaviors that day and does not feel any remorse for his actions." The record indicates that any remorse defendant feels is superficial and selfish. Defendant might think twice about harming another person only if a sufficiently large material loss could occur as a consequence, but that would be the only consequence that would be meaningful to him.

Defendant concludes, "[Defendant] has shown a commitment to abstaining from any violent behavior and, for that matter, any misconduct as evidenced by his disciplinary-free conduct for the past 10 years and his current level II placement." Contrary to defendant's position, the danger that defendant presents arises when defendant is mixed with firearms, intoxicants, and police. When that combination occurs, it has a high potential of being lethal. Defendant's inability to obtain a firearm in prison could be a large factor in the lack of violence he has inflicted during the past 10 years.

In sum, substantial evidence supports the trial court's finding that resentencing defendant would pose an unreasonable risk of danger to public safety.

14

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER _____
                        Acting P. J.


We concur:


CODRINGTON _____
                        J.


FIELDS _____
                        J.

15