Filed 12/9/25  P. v. Velasquez-Gomez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SANTOS DIEGO VELASQUEZ-GOMEZ,<br><br>    Defendant and Appellant. | A170878<br><br>(Marin County Super. Ct. No. SC208257A) |

Santos Diego Velasquez-Gomez (Gomez)[1] appeals from his convictions for three counts of committing a lewd act on a person 14 or 15 years of age who is at least 10 years younger than him. (Pen. Code, § 288, subd. (c)(1).[2])  He contends that the trial court's admission of the out-of-court statements of the victim—his then 14-year-old stepdaughter—violated the Evidence Code (Evid. Code, §§ 240, 1230) as well as the Sixth Amendment Confrontation Clause (U.S. Const., 6th Amend.).  In addition, he contends that the convictions are supported by insufficient

---

[1] Appellant was booked under the alias Miguel Angel Garcia, but documents in the record—including jury verdict forms and the abstract of judgment—identify him as Santos Diego Velasquez-Gomez.  Therefore, we refer to appellant by that name in the opinion.

[2] Undesignated statutory references are to the Penal Code.

evidence of his stepdaughter's age.  Although we conclude that one set of statements was admitted in violation of his Confrontation Clause rights, the error was harmless beyond a reasonable doubt.  Because Gomez's other arguments lack merit, we affirm the judgment.

## BACKGROUND

### A.

Gomez came to the attention of the police after Jane Doe, his minor stepdaughter, told school staff that he was abusing her.  One day in March 2019, Doe came to the school office distraught.  When the assistant principal, R.C., spoke with Doe in his office, she was initially unwilling to reveal the source of her distress.  According to R.C.'s testimony at trial, she eventually said that there was something going on at home involving her stepfather that had been happening for a long time.  Doe said that "she was very worried about her two-year-old brother, and that she didn't want to be responsible for anything that could happen to the family."  She was worried that her mother was going to be upset with her and that she would be blamed for what was happening.

R.C. had also asked the school's community liaison, M.B., to meet with Doe.  M.B. testified at trial that Doe was upset the entire time she was meeting with her.  Doe shared that there was "something happening at home," her "stepdad was abusing her," and "the abuse started when she was very young."  The abuse was "happening in the house."  Doe stated that Gomez threatened to take her little brother away if she told anyone.  Doe said, " 'I just don't feel good about that, that's why I haven't said anything.  But I don't know what to do.  I feel so bad my mom is going to be mad at me.  I want my brother to have a family.' "

Once Doe revealed she was being abused, R.C. stopped the conversation and got law enforcement involved.

Doe subsequently met with a police officer, Anthony Augustyn, in R.C.'s office. In response to Officer Augustyn's questions, and with his body worn camera recording, Doe stated that her stepfather had been sexually assaulting her for some time. She became emotional while relating this information. In response to further questioning, Doe provided Gomez's full name and birth date, stated that the last assault had occurred the day before in the living room of their house, and indicated that she was no longer wearing the clothes she had been wearing during the assault. Doe also agreed to participate in a medical examination for the purpose of gathering evidence.

A police detective, Phillip Melodia, asked Gomez to come speak with him at the police station regarding his stepdaughter. Gomez's interview at the police station with Detective Melodia was recorded and entered into evidence. Gomez told police that Doe was his 14-year-old stepdaughter. When Gomez initially denied having sexual relations with her, Melodia told him that Doe had reported that Gomez had had sex with her within the last 24 hours. Gomez eventually confessed to having vaginal intercourse with Doe on three occasions in the last four or five months, with the most recent incident occurring in the last day or two. All three incidents occurred in the living room of their home, while Doe's mother was at work; on each occasion, Gomez did not use a condom but pulled out before ejaculating.

Later the same day, Doe was examined and interviewed by a Sexual Assault Response Team nurse who swabbed Doe's breasts for potential DNA evidence; DNA testing later determined that 75 percent of the DNA recovered from the swab was contributed by Gomez. The nurse did not detect any injuries or dried bodily fluids or secretions on Doe. Doe indicated that she had showered after the last sexual assault.

A few days later, Detective Melodia interviewed Gomez at the county jail. The two discussed the three sexual assaults, and

3

Gomez made no attempt to recant his admissions. Gomez also related that his brother had come to visit him in jail and asked him if what they said he had done was true. Gomez said that he told his brother that it was.

<h2 style="text-align:center">B.</h2>

As relevant here, Gomez was charged with three counts of committing a lewd act upon a child 14 or 15 years old who is at least 10 years younger than the defendant (§ 288, subd. (c)(1)).

At the January 2024 trial, the prosecution served Doe with a subpoena but she failed to appear.[3] Over Gomez's objection, the trial court declared her unavailable as a witness under Evidence Code section 1230, which makes certain out-of-court statements admissible if the witness is unavailable. The trial court found that Doe was unavailable because the People had exercised reasonable diligence in trying to secure Doe's appearance at trial. (See Evid. Code, § 240, subd. (a)(5).) The court found that "as a factual matter, the People did make repeated efforts over a several month period for trial beginning in October, and tried multiple different avenues of getting through to Jane Doe."

The defense also argued that Doe's out-of-court statements could not be admitted because under the Sixth Amendment Confrontation Clause, testimonial statements of an unavailable witness are admissible only where the defendant has had a prior opportunity to cross-examine the witness. (See *Ohio v. Clark* (2015) 576 U.S. 237, 243 (*Ohio*).) The court rejected this argument, however, because it concluded that the statements Doe made at school were not testimonial in nature.[4] As a result,

---

[3] Doe was 19 at the time of the trial.

[4] The trial court excluded inculpatory statements Doe made to the nurse examiner, however, holding that they were testimonial.

R.C., M.B., and Officer Augustyn were permitted to testify as to Doe's statements to them.

At the close of evidence, the defense filed a motion for acquittal under section 1118.1, arguing that the prosecution had failed to present sufficient evidence of Doe's age, for purposes of establishing that she was 14 or 15 and that she was at least 10 years younger than Gomez under section 288, subdivision (c)(1). The only evidence of Doe's age came from Gomez's statements to the police. The trial court denied the motion, finding that because Gomez was someone "that lived with [Doe] and had a parental relationship," his statements as to her age were sufficient.

The jury found Gomez guilty of all three counts under section 288, subdivision (c)(1). The trial court sentenced Gomez to three years and four months in prison.

## DISCUSSION

### A.

Gomez challenges the trial court's admission of the statements Doe made at school—to R.C., M.B., and Officer Augustyn—under the hearsay exception in Evidence Code section 1230. We conclude that the trial court did not err.

Under Evidence Code section 1230, a declarant's prior statement is not inadmissible hearsay if the declarant is unavailable as a witness and the earlier statement, as relevant here, "created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." Evidence Code section 240 provides that a declarant is " 'unavailable as a witness' " when, among other circumstances, the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by

5

the court's process." (Evid. Code, § 240, subd. (a)(5).) Reasonable (or "due") diligence means " 'persevering application, untiring efforts in good earnest, efforts of a substantial character.' " (*People v. Cogswell* (2010) 48 Cal.4th 467, 477 (*Cogswell*).) Factors bearing on due diligence include the timeliness of the efforts, the importance of the witness, and " 'whether leads of the witness's possible location were competently explored.' " (*People v. Herrera* (2010) 49 Cal.4th 613, 622, 630 (*Herrera*).)

Gomez asserts that the trial court erred in ruling that Doe was unavailable because the prosecution did not exercise reasonable diligence in securing her attendance in court. We review the trial court's factual findings for substantial evidence and independently review whether the facts demonstrate that the prosecution exercised due diligence. (*Herrera*, *supra*, 49 Cal.4th at p. 623; *People v. Lawson* (2020) 52 Cal.App.5th 1121, 1128 (*Lawson*).)

Here, the prosecution's investigators began efforts to locate and serve Doe beginning in February 2023, about 11 months before the start of the trial.[5] The investigators visited and surveilled Doe's house; left cards; checked license plates for vehicles parked at her residence; investigated phone numbers for Doe; repeatedly texted and called her; followed her; visited her workplace; contacted Doe's friend and visited the friend at two separate residences and left cards. The prosecution also unsuccessfully tried to reach Doe through her mother's attorney.

In November 2023, after finding a new telephone number for Doe, an investigator called the number and was able to speak with Doe and tell her that the trial date had been set. Doe said she was not able to talk at that time, and, although she agreed to

---

[5] At the hearing on unavailability, the prosecution described its efforts in an offer of proof, which was implicitly accepted by the defense. On appeal, Gomez does not dispute the facts in the offer of proof.

speak later that day, she never responded to any subsequent communications from the investigator, including texts, calls, and visits to her house.

Ultimately, an investigator was able to serve Doe with a subpoena on January 12, 2024, four days before the start of trial, when he followed her from her home to her workplace. At that time, the investigator discussed the subpoena with Doe and explained "the need to be [in court]" on the morning of January 16. On January 16, when Doe failed to appear, the prosecution's victim witness office supervisor tried to call Doe "several times" on her most recent telephone number and tried to call Doe's mother as well, with no luck. Based on these circumstances, the trial court found that the People "did make repeated efforts over a several month period . . . and tried multiple different avenues of getting through to Jane Doe" and that Doe's failure to appear was not attributable to the People's lack of diligence.

We agree with the trial court that the People exercised reasonable diligence in attempting to secure Doe's attendance at trial. Despite the prosecution's timely and persistent efforts over 11 months to contact her via multiple avenues, Doe was steady in her noncooperation over that months-long period. She received the subpoena, she was aware of the trial date and the need to appear at trial, she defied the subpoena, and she ignored multiple attempts to reach her the morning of trial. Gomez inaccurately asserts that "no efforts were expended in trying to get [Doe to court] absent the service of a subpoena." There is no doubt that the People expended the bulk of their efforts on serving the subpoena, but their investigator also advised Doe that a trial date had been set and that she needed to appear for trial, and the victim witness office repeatedly attempted to call both Doe and her mother the day of trial.

Gomez suggests that the trial court could have informed Doe's attorney that the court would consider imposing sanctions

7

if Doe continued to ignore the subpoena[6], or the court could have issued a body attachment to attempt to compel her attendance. (See Pen. Code, § 1331 [providing that, when a witness disobeys a subpoena, the court may punish the person for contempt]; Code Civ. Proc., § 1993, subd. (a)(1) [providing that when a witness has failed to appear pursuant to a subpoena, the court may issue a warrant directing the sheriff to arrest and bring the witness to court]; see also *People v. Brinson* (1961) 191 Cal.App.2d 253, 258.) But Gomez fails to grapple with Code of Civil Procedure section 1219, subdivision (b), which provides that "[n]otwithstanding any other law, a court shall not imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime."  The purposes of Code of Civil Procedure section 1219, subdivision (b), are " 'to protect victims of sexual assault from further victimization resulting from imprisonment or threats of imprisonment by our judicial system,' " and to encourage more victims to report sexual assault. (*Cogswell*, *supra*, 48 Cal.4th at p. 478.)  In enacting that provision, the Legislature recognized that "sexual assault victims are particularly likely to be traumatized because of the nature of the offense" and the difficulty of having "[t]o relive and . . . recount . . . intimate details of a sexual assault" in a public courtroom.  (*Ibid.*; see also *Lawson*, *supra*, 52 Cal.App.5th at p. 1132.)  If victims of sexual assault could be jailed for refusing to testify against the perpetrator, then they would face an even greater disincentive to coming forward in the first place. (*Cogswell*, at p. 478; *Lawson*, at pp. 1132-1133.)

---

[6] We note that the trial court had been informed that Doe's attorney had never been able to meet or even speak with her, so there was no reason to think that threatening sanctions through her attorney would have any effect.

Even though Code of Civil Procedure section 1219, subdivision (b), does not exclude the possibility that a court might issue a body attachment or threaten sanctions short of imprisonment, it does necessarily inform our assessment of the prosecution's reasonableness. (See *Cogswell*, *supra*, 48 Cal.4th at pp. 478-479; *Lawson*, *supra*, 52 Cal.App.5th at p. 1128.) As our Supreme Court has explained, "[t]o have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly," especially when the witness is a victim of sexual assault. (*Cogswell*, at pp. 477-478.) Indeed, even if a sexual assault victim is transported to court against her will, the trial court could not hold her in contempt and jail her until she agreed to testify because that remedy is prohibited by Code of Civil Procedure section 1219, subdivision (b). (*Cogswell,* at p. 479.) The "confinement of a sexual assault victim to ensure her presence at the assailant's trial . . . [is not] a reasonable means of securing the witness's presence." (*Ibid*.)

Nor is the " ' "extreme" ' " step of fining or threatening to fine a sexual assault victim necessary to establish due diligence here. (See *Cogswell*, *supra*, 48 Cal.4th at p. 479; *People v. Smith* (2003) 30 Cal.4th 581, 624 (*Smith*); *Lawson*, *supra*, 52 Cal.App.5th at p. 1130.) In *Smith*, our Supreme Court considered the argument that, where a sexual assault victim had come to court and refused to testify, the witness was not unavailable because the court did not fine her for contempt of court. (*Smith*, at p. 624.) In rejecting the argument, *Smith* held that "[t]rial courts 'do not have to take extreme actions before making a finding of unavailability.' " (*Ibid*.)

For these reasons, we disagree with Gomez's contention that the prosecution was not reasonably diligent absent the pursuit of more intrusive measures against Doe. The record reflects that, despite the prosecution's perseverance, Doe was

9

steadfast in refusing to cooperate over many months. In the circumstances here, and taking into account the purposes animating Code of Civil Procedure section 1219, subdivision (b), the prosecution was not required to seek to arrest and transport Doe to court against her will or threaten her with monetary fines to establish due diligence. (See Evid. Code, § 240, subd. (a)(5).)

Gomez's reliance on *People v. Gomez* (2025) 115 Cal.App.5th 943, 958-960 (*Gomez*)[7], is unavailing. In *Gomez*, the trial court determined that a child victim of sexual assault was unavailable after her mother, who appeared in court, refused to bring the child to court out of fear of traumatizing her. (*Id*. at pp. 947-948, 949-953.) *Gomez* concluded that the record did not establish that the mother "was absolutely refusing to bring [the child] to court" where the mother had "very suddenly changed her mind" and neither the court nor the prosecution had questioned the mother about "the extent to which [the] [m]other was resolute in [her] position." (*Id*. at pp. 957-960.) *Gomez* explained that in light of the mother's sudden change of heart—which occurred less than 24 hours before the child was scheduled to testify—and her "equivocal" statements at the unavailability hearing, reasonable efforts should have included exploring the mother's amenability to potential accommodations to assist the child witness and confirming the mother's understanding that her refusal to bring the child to court was in violation of a court order. (*Id*. at pp. 950, 959-960.)

The circumstances here bear no resemblance to those in *Gomez*. Whereas in *Gomez* the mother had been cooperative up until the afternoon before the scheduled testimony (*Gomez*, *supra*, 115 Cal.App.5th at pp. 950-951), Doe was uncooperative throughout. Unlike in *Gomez*, there was no sudden change of

---

[7] Although the defendant in *Gomez* bore the same surname as appellant, that case is unrelated to the instant one. (See *Gomez*, *supra*, 115 Cal.App.5th 943.)

10

heart, no evidence of equivocation, and no reason to think further efforts would induce Doe's cooperation.  Moreover, *Gomez* made clear that the court was "not suggesting the [trial] court needed to actually find [the] [m]other in contempt or even threaten to do so, especially considering that this is a case of sexual abuse."  (*Id.* at p. 959.)

In sum, the trial court did not err in holding that Doe was unavailable for purposes of Evidence Code sections 240, subdivision (a)(5), and 1230.

**B.**

Gomez also argues that the admission of Doe's statements to school officials and to Officer Augustyn violated his Sixth Amendment right to confront the witnesses against him.  (See U.S. Const., 6th Amend.)  Although we agree that Doe's statements to Officer Augustyn were admitted in violation of the Confrontation Clause, we conclude that the error was harmless beyond a reasonable doubt.

**1.**

The Sixth Amendment Confrontation Clause prohibits the admission of testimonial statements of a witness who does not appear at trial unless the witness was unavailable and the defendant had a previous opportunity to cross-examine that witness.  (*Smith v. Arizona* (2024) 602 U.S. 779, 783; *Ohio, supra,* 576 U.S. at p. 243; see also *People v. Barrett* (2025) 17 Cal.5th 897, 1021 (*Barrett*).)  Nontestimonial hearsay, however, is "exempted . . . from Confrontation Clause scrutiny altogether." (*Crawford v. Washington* (2004) 541 U.S. 36, 54, 68 (*Crawford*); see also *Smith v. Arizona*, at pp. 784, 800; *Ohio*, at p. 245; *Davis v. Washington* (2006) 547 U.S. 813, 823-825 (*Davis*).)

The People argue that the admission of Doe's statements did not implicate the Confrontation Clause because they were nontestimonial.  To assess whether a particular statement was

testimonial, we objectively consider all the circumstances to determine whether the primary purpose of the statement was to create a record for criminal prosecution. (*Ohio*, *supra*, 576 U.S. at pp. 244-245; see also *Davis*, *supra*, 547 U.S. at p. 822 [explaining that statements "are testimonial when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"].) Relevant considerations include whether the statements were made during an ongoing emergency—which may suggest that the statements are not testimonial—the level of formality of the interview, the statements and actions of the declarant and the interrogators, the identity of the interrogator, and the condition of the declarant. (See *Michigan v. Bryant* (2011) 562 U.S. 344, 358-366 (*Michigan*); *Ohio*, at pp. 244-245.) A quintessential example of a testimonial statement is one given during a police interrogation, which is "directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." (*Davis*, at p. 826.) We review independently whether particular statements are testimonial. (See *People v. Hall* (2024) 107 Cal.App.5th 222, 237.)

We have little difficulty in concluding that the primary purpose of Doe's statements to R.C., her school's assistant principal, and M.B., her school's community liaison, was not testimonial. R.C. and M.B. acted in the moment to help understand and address Doe's visible distress. Doe was crying and "upset the whole time" when she was speaking to R.C. and M.B. R.C.'s goal was to "[en]sure the safety of the students"; he testified that when school staff see a student in distress or "something didn't seem right . . . we would do . . . a safety check to make sure everything is okay." Similarly, M.B. testified that "I just wanted [Doe] to be okay, and [to] just be there for her." Consistent with her goal of attending to Doe's well-being, M.B. asked Doe, " 'are you okay?' "

12

Neither R.C. nor M.B. sought to elicit any details once Doe revealed that her stepfather was abusing her—an approach that is incompatible with building a record. M.B. "didn't want to ask questions" and stopped the discussion after Doe revealed that she was being abused by her stepfather. R.C. "made the decision to stop the conversation, . . . and to have law enforcement take over from that point."

Doe's reluctance to report the abuse to R.C. and M.B. also reinforces that the primary purpose of those conversations was not to build a record for a criminal case. Doe was initially unwilling to reveal why she was upset. She made clear that she was fearful of the consequences that would follow from reporting her stepfather's abuse, expressing concern that her two-year-old brother would be taken away, that her mother would be upset with her, and that others would blame her.

That R.C. and M.B. were educators is also "highly relevant" in determining the primary purpose of the interview because "the relationship between a student and [her] teacher is very different from that between a citizen and the police." (*Ohio*, *supra*, 576 U.S. at p. 249.) Statements given to civilians like R.C. and M.B. are "much less likely to be testimonial than statements to law enforcement officers," whose job it is to investigate crimes for potential prosecution. (*Id.* at p. 246; see also *id.* at p. 249 ["Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."].)

*Ohio* is instructive. *Ohio* held that a toddler's statements to his preschool teachers were non-testimonial where the teachers questioned the toddler about the source of his visible physical injuries, asking him " ' "Who did this?" ' " and " ' "What happened to you?" ' " (*Ohio*, 576 U.S. at p. 241.) *Ohio* reasoned that the child's statements were given in the context of an

13

ongoing emergency in which the teachers' "immediate concern was to protect a vulnerable child who needed help." (*Id*. at pp. 246-247.) The teachers sought "to identify the abuser in order to protect the victim from future attacks." (*Id*. at p. 247.) The circumstances here are similar in that R.C. and M.B., two educators, observed that their student was in distress, and they questioned her to identify the source of that distress out of concern for her safety and well-being.

Whether Doe's statements to Officer Augustyn were testimonial is a closer question. Objective circumstances indicating that the primary purpose of the interview was nontestimonial include that it took place in an informal setting, in a school office, with R.C. present. During the interview, Doe became "somewhat emotional" and cried "at one point." In addition, after Doe indicated that her stepfather was sexually abusing her, Officer Augustyn did not seek to obtain a comprehensive statement because his department's standard procedure was to refrain from taking a detailed preliminary statement from a victim of sexual assault, to avoid making the victim repeat the details multiple times.

However, other objective circumstances make clear that the primary purpose of the interview was to gather evidence for the purpose of a potential criminal prosecution. Officer Augustyn was, of course, a police officer—someone "principally charged with uncovering and prosecuting criminal behavior." (*Ohio*, 576 U.S. at p. 249.) Moreover, after R.C. told Officer Augustyn he wanted him to "investigate," Officer Augustyn's actions reflected his recognition that the interview was important for gathering evidence. In his trial testimony, he described his conduct in the interview as "gathering . . . information," albeit preliminary. At the start of the interview, Officer Augustyn obtained an information sheet that included Doe's photograph, address, and grades. He recorded the interview with his body camera, and he

14

testified that his department policy was to "have the camera activated for any time that you thought it could capture anything of evidentiary value." Officer Augustyn's questioning also indicated that the purpose was to build a record: rather than seeking to comfort or reassure Doe, he began the interview by asking her a series of questions, including her address, how long she had attended the school, what grade she was in, what family members she lived with, and the nature of her "family dynamic." Once Doe revealed that her stepfather had sexually assaulted her, Officer Augustyn asked her for her stepfather's full name and date of birth, the date and location of the most recent assault, where specifically in the home it had occurred, whether she was still wearing the same clothes she had been wearing at the time of the assault, and whether she was willing to participate in a medical exam.

Officer Augustyn's questioning thus reflected that the primary purpose of the interview was to establish "the facts of a past crime" rather than to provide assistance during an ongoing emergency. (See *Davis*, *supra*, 547 U.S. at p. 826.) Although it is true he needed to understand the nature of the allegation against Gomez in order to determine whether it was safe for her to go home with him, his interrogation of Doe went well beyond eliciting that basic information. Officer Augustyn's questioning was directed at obtaining information important for establishing evidence for a criminal prosecution, including Doe's grade in school, the date of the most recent assault, whether the clothes she was wearing would supply evidence, and the precise location in the home where physical evidence might be found. (Cf. *Davis*, at p. 830 [holding that where a domestic violence victim's statements "recounted, in response to police questioning, how potentially criminal past events began and progressed," and the police interview occurred "some time after the events described were over," the statements were "inherently testimonial"].)

Because Doe's statements to Officer Augustyn were testimonial and therefore should not have been admitted without affording Gomez an opportunity to cross-examine her, we next consider whether the erroneous admission of the statements was prejudicial.

**2.**

A Confrontation Clause violation is harmless if the People establish, beyond a reasonable doubt, that the error did not affect the verdict. (*Barrett, supra*, 17 Cal.5th at p. 1022 [applying the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, to a Confrontation Clause violation].) Here, the error was harmless in light of Gomez's detailed confession and the other evidence in the record corroborating that confession.

After being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, Gomez admitted to police that he had sexual intercourse with his 14-year-old stepdaughter on three occasions. He described each encounter in detail, explaining how it unfolded, the exact location in their residence, the clothes Doe was wearing, how their bodies were positioned, how long each act of intercourse lasted, where he ejaculated, whether he used a condom, and where Doe's mother and two-year-old brother were at the time. In addition, Gomez wrote an apology letter to Doe that stated, "Dear [Doe], I really apologize for what I did to you. I promise not to do any more because it's not right."

Further, his confession was corroborated by physical evidence gathered during a medical exam of Doe as well as by her statements to R.C. and M.B.[8] The nurse who performed the exam

_____

[8] This evidence would have sufficed to satisfy the corpus delicti rule, under which the body of the crime may not be proven by exclusive reliance on the defendant's own extrajudicial statements. (See *People v. Alvarez* (2002) 27 Cal.4th 1161, 1171 ["The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an

16

swabbed Doe's breasts to collect any DNA material that may have been left on her skin.[9] Subsequent DNA testing of the swab determined that it contained a mixture of DNA from Gomez and Doe: 75 percent of the DNA collected from Doe's breast belonged to Gomez, and 25 percent of the DNA was from Doe. The criminalist who tested the swab testified that although "if you live around someone you could potentially get your DNA on their body," that type of DNA transfer is not a plausible explanation for large amounts of DNA found on an alleged victim. The presence of a large proportion of Gomez's DNA on Doe's breast— evidence for which there is no plausible, innocent explanation— strongly corroborates Gomez's admission to sexual assault.

Doe's statements to R.C. and M.B. further corroborate Gomez's confession. She revealed that her "stepdad was abusing her," that it was "happening in the house," and that he had been abusing her since she was young. Doe was distraught and crying when she made these statements. Doe's statements thus provided evidence of Gomez's identity as her abuser, the location of the abuse, and the harm she was suffering as a result.

Because Gomez's confession was confirmed by other properly admitted evidence, the Confrontation Clause error was harmless beyond a reasonable doubt.

---

inference of criminal conduct, even if a noncriminal explanation is also plausible."].)

[9] The nurse examiner did not observe any injuries on Doe's body, nor did she find any evidence of dried secretions on her body using a UV lamp. These findings are consistent with Gomez's statements that the most recent sexual encounter was consensual, the intercourse lasted only two to three minutes, and he withdrew and ejaculated into his hand. The findings are also consistent with evidence that Doe had taken a shower between the time of the most recent assault and the medical exam.

## C.

Finally, Gomez argues that the record contains insufficient evidence to establish that Doe was between the ages of 14 and 15 at the time of the offenses and that she was more than 10 years younger than him, as necessary to establish his liability under section 288, subdivision (c)(1). As a result, he says, the trial court erred in denying his motion for acquittal under section 1118.1. Reviewing the record for substantial evidence (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35-36), we disagree.

At the time of his initial police interview in March 2019, Gomez stated that Doe was 14 years of age and that her birthday was in May 2004. He also told police that he was 42 years old, making him 28 years older than Doe. Because the three assaults occurred within the four to five month period before the interview, his statements established that during the relevant period, Doe was 14 and Gomez was well over 10 years older than her. Gomez was Doe's stepfather and resided in the same house with her, so he can reasonably be expected to know Doe's age. The record contains substantial evidence establishing Doe's age.

### DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:

SIMONS, ACTING P. J.
CHOU, J.

*People v. Santos Diego Velasquez-Gomez* (A170878)

18