Filed 3/12/26  P. v. Matlock CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C101094 |
| Plaintiff and Respondent, | (Super. Ct. No. MAN-CR-FE-COD-2015-0013988) |
| v. | |
| RYAN CHARLES LEE MATLOCK, | |
| Defendant and Appellant. | |

Originally charged with murder during the commission or attempted commission of a robbery and burglary, defendant Ryan Charles Lee Matlock pleaded guilty to an amended count of voluntary manslaughter and admitted an amended enhancement that he personally used a firearm during the offense.  Defendant appeals the trial court's order denying his Penal Code section 1172.6[1] petition for resentencing on his manslaughter

---

[1]  Undesignated statutory references are to the Penal Code.

1

conviction following an evidentiary hearing. He contends substantial evidence does not support the trial court's findings that he was a major participant who acted with reckless indifference to human life. We agree and reverse with directions.

BACKGROUND

At the section 1172.6 evidentiary hearing, the parties relied on the preliminary hearing transcript[2] and neither party presented new evidence.

A. *The Evidence at the Preliminary Hearing*

In 2015, S. lived in a house in Manteca with her boyfriend Timothy Spino (a known marijuana dealer), their two-year-old daughter, S.'s sister B., B.'s one-year-old daughter, and a roommate. Defendant was B.'s former boyfriend. He lived at the house about a year prior to the incident.

On October 16, 2015, defendant went to the house to visit B. At the time, Timothy had a large tote bag or container of marijuana stored in the basement and money in a safe in his bedroom. The back door to the house was left open so Timothy's dog could go outside. S. said that at some point, defendant asked B. if he could take the dog for a walk, but she said no.

Timothy eventually left the house to go skateboarding with his friend, Michael. Defendant later asked S. where Timothy was. She called Timothy, and he told her he would be home soon. She did not tell defendant that Timothy was on his way back to the house.

---

[2] In addition to a copy of the preliminary hearing transcript, the People submitted the abstract of judgment and the signed plea agreement at the evidentiary hearing. Based on our review of the record, it appears the copy of the preliminary hearing transcript submitted as evidence omitted the final day of the multi-day hearing where the People had "one witness to finish up." It is not clear from the record before us who this witness was, or what occurred at the continued hearing. Because we consider the trial court's findings in light of the evidence presented at the section 1172.6 hearing, this missing portion of the transcript has no bearing on the issue on appeal.

2

A few minutes later, around 8:30 p.m., S. walked to the bathroom to get ready for work; B. and her daughter were also in the bathroom and defendant stood in the bathroom doorway conversing with them. The roommate was in his bedroom. Defendant suddenly said, "oh shit," and S. saw two African-American men with their faces partially covered inside the house. One pointed a gun at her and said, "Get on the ground. Get on the ground." She did not recall seeing defendant after the intruders suddenly appeared.

S. dropped to the ground while B. tried to close the bathroom door. Someone pushed or fell into the door, breaking it open. Through the broken door, S. saw her daughter in the hallway, and she reached out to pull her into the bathroom. As she did so, she saw a hand holding a gun down the hall near the kitchen; the person's body was obscured so she could not tell who it was.

S. heard a gunshot. She waited a few minutes before leaving the bathroom. She did not realize Timothy had already returned home from skateboarding until she found him lying on the living room floor gasping for air; he had been shot and was bleeding. S. called 911 and emergency personnel responded. Timothy later died of a gunshot wound to the chest. According to S., the entire incident happened very fast.

Michael testified that when he and Timothy returned to the house he heard a commotion and saw two men down the hall near the bathroom door, which had been damaged. Timothy yelled, "What the fuck?" and began trying to shove the intruders out toward the back door; Michael hid in a bedroom closet. He heard a gunshot a few seconds later and then footsteps running toward the front door. The events unfolded very quickly and he estimated that from the time he and Timothy entered the house until he heard the gunshot was about a minute.

Defendant and his brother, codefendant Kenneth Gatison, were arrested 10 days after the shooting. At the time, defendant was 19 years old, and Gatison was 23. Codefendant Tito Tomito Jones, Jr., was arrested two months later, and brothers Arthur

and Jayontay Thomas (referred to by their first names for clarity) were also subsequently arrested.

During a police interview, defendant told Detective Stephen Schluer that some "bullshit" had been going on in his life and he repeatedly cried throughout the interview. Initially, defendant claimed he came to Manteca with Gatison, Jones, and Jayontay and Arthur to visit his ex-girlfriend B., but Jayontay and Arthur had robbed him of $600 at B.'s house. Defendant said both Jayontay and Arthur were armed and they came through the back door and told him to get on the ground; Arthur took $600 from him at gunpoint while Jayontay kicked in the bathroom door. After being robbed, defendant ran out of the house and called his sister for a ride. He denied leaving the area in the same car with Gatison, Tito, Arthur and Jayontay. Defendant said he did not learn his "friend" Timothy had been shot and killed until the day before his arrest.

At some point during the interview, defendant described "kickin it" with B. when "they kicked in the door and yelled for everyone to 'get down.' " He then heard a gunshot from the kitchen where Jayontay was standing. Detective Schluer could not recall whether defendant said he was in the hallway or living room when the shot was fired, but was sure defendant said he was not in the kitchen.

Later in the interview, defendant changed his story about being robbed by Jayontay and Arthur. He told Detective Schluer that sometime before the incident in Manteca he had been in San Pablo with Gatison, Jones, Jayontay, and Arthur. He did not know Jayontay or Arthur very well. Defendant told the group he wanted to visit B. in Manteca, and he mentioned that Timothy had "hella weed and pills" and "pounds of weed" at the house. Jayontay got a "sick look" on his face and said, "I'll strip him." Defendant told Jayontay not to do anything that would jeopardize defendant's freedom. Defendant also said to "[b]e cool" and "fall back" because he knew the people at the house, he used to live there, Timothy was "cool," and he "still love[d] the girl." Jayontay replied, "[i]t's not about you. It's about the money."

4

Gatison initially denied being in Manteca when Timothy was killed but later told Detective Schluer that he went there with defendant, Jones, Jayontay and Arthur. Although Jones was a friend, he did not know Jayontay and Arthur well. While Jayontay and Arthur went inside the house to buy 600 pills, Gatison and Jones went to McDonald's and then sat in the car in an alleyway behind the house. Jayontay and Arthur ran out of the house and said there was a struggle inside. Gatison claimed defendant was not in the car when it left Manteca.

Jones, also 19 years old, first told police that he drove from San Pablo to Manteca with defendant, Gatison, Jayontay and Arthur to buy marijuana; they went to the Bass Pro Shops and McDonald's before they purchased marijuana and returned to San Pablo. He said he did not know Jayontay or Arthur well.

Jones denied hearing anyone in the group discuss a robbery and said he never saw a gun that night. He later said that at some point after dropping defendant off at B.'s house, Jayontay and Arthur went inside while he waited in the car; about 15 or 20 minutes later, Jayontay and Arthur ran out of the house and told him to "drive, drive." According to Jones, everyone in the group, including defendant, left together in the car. On the ride home, Jones asked what happened inside the house, and Jayontay said, "some shit" and "don't trip." Arthur said, "Bruh got shot." Jones told Detective Schluer that he thought Jayontay was the shooter.

Cell phone records showed that defendant and Gatison exchanged several text messages and phone calls the night of the shooting. Shortly before 7:00 p.m., defendant texted Gatison, "It's hella ppl in der." Gatison responded, "How many[?]" and defendant replied, "Never mind, no it's not." Gatison then texted defendant, "So when you want niggas to go in did he show the stuff yet." Two minutes later, defendant called Gatison. The call lasted over a minute.

Gatison then texted defendant, "Try and keep them all in one room." Defendant responded, "the roommate just walked out," and Gatison texted, "is he leaving or

5

what[?]" After defendant texted Gatison "idk," Gatison responded, "alright where the kids at[?]" Defendant texted, "Living room wit [B.] and me I think tim finna going to bust a move he finna go skating." Gatison replied, "So when you want niggas to come in[?]" Defendant texted Gatison, "When he pull off [B.] just told me he bought a gun so that's a come up too." Gatison replied, "Oh, all right tell me when he pull off."

A four minute call from Gatison to defendant followed. A few minutes later, defendant texted Gatison, "I'm gonna take him to the back the Door unlocked." Gatison responded, "Tell me when he in the back," and defendant replied, "Ight." Gatison then called defendant and the call lasted about one minute 26 seconds. Gatison texted defendant a minute later, "she finna walk to the store." Gatison called defendant again. Several minutes later, Gatison texted defendant asking, "You in the back yard[?]" Gatison called defendant again. Defendant then texted Gatison, "Yea but the dog ain't fucking wit it ima walk to the store with [B.] and take the dog." Gatison called defendant, and defendant texted Gatison a few minutes later, "We leave wit dog." Gatison texted back, "what that suppose to mean[?]" The next communication between the two was a missed call from defendant to Gatison. A few minutes later, Gatison called defendant. That call lasted nearly seven minutes. Gatison then texted defendant, "It's good or naw?" Several calls between Gatison and defendant and Gatison and Arthur followed about 8:30 p.m. A few hours later, around 1:00 a.m., Gatison texted with another individual saying he had "been threw [*sic*] hella shit today" and "some shit happened that wasn't supposed to happen" that was "really bad."

B. *Defendant's Plea and Sentencing*

Following the preliminary hearing, defendant, Gatison, and Jones were jointly charged with the special circumstance murder of Timothy during the commission or attempted commission of a robbery and a burglary (§§ 187, subd. (a), 190.2, subd. (a)(17)(A), (G)), first degree residential burglary (§ 459), attempted first degree residential robbery in concert (§§ 664/213, subd. (a)(1)(A)), two counts of assault with a

6

firearm (§ 245, subd. (a)(2)), and two counts of child abuse and endangerment (§ 273a, subd. (a)).[3]

In January 2018, defendant pleaded guilty to an amended count of voluntary manslaughter (§ 192, subd. (a)), count 1), first degree residential burglary (§ 459, count 2), and two counts of child endangerment (§ 273a, subd. (a), counts 6 & 7). He admitted an amended enhancement alleging he personally used a firearm during the manslaughter offense. (§ 12022.5, subd. (a).) Defendant stipulated to the preliminary hearing transcript and the police report as the factual basis for his plea.[4] The trial court sentenced defendant to the negotiated term of 25 years in prison.

C. *The Petition for Resentencing*

Defendant later petitioned to vacate his manslaughter conviction under section 1172.6. The trial court issued an order to show cause and set an evidentiary hearing.

At the hearing, the People conceded that Jayontay was the likely shooter and there was no evidence defendant intended to kill Timothy. But they asserted defendant was a major participant and acted with reckless indifference because he masterminded the plan to rob Timothy of his drugs and money, communicated with the group throughout the evening, knew Jayontay and Arthur were armed, had time to intervene to stop the dangerous situation when so many people were present in the house and did not, and fled the scene.

---

[3] Codefendants Arthur and Jayontay were charged separately.

[4] Although defendant admitted the added personal firearm use enhancement attached to the amended voluntary manslaughter count under the terms of the plea deal, the portions of the preliminary hearing transcript provided to the trial court during the section 1172.6 hearing and included in the record on appeal do not reflect *any* personal firearm possession or use by him. However, defendant also stipulated to the police reports as part of the factual basis for the plea; the reports are not included in the record on appeal.

Defense counsel argued that defendant was not a major participant and did not act recklessly indifferent during the robbery. He believed the robbery, as planned, would be straightforward and quick and would pose little risk of harm because Timothy was supposed to be out of the house and the women and children were supposed to be together in the bathroom when the robbery occurred, minimizing the risk to each of them. Counsel further argued that, at only 19 years old, defendant's youthfulness prevented him from fully appreciating the risk of death posed by the robbery plan.

The trial court took the matter under submission and denied the petition in May 2024. The court found defendant was not the actual killer and did not act as an aider and abettor with the intent to kill. Nevertheless, the court found, beyond a reasonable doubt, that defendant was a major participant acting with reckless indifference to human life and could still be convicted of murder despite the changes to the relevant statutes. The court reasoned that defendant previously dated B. and knew the location of the house; defendant was the one who told the group about Timothy's large marijuana stash at the house, and defendant contacted B. to visit so he could gain access to the house. After being inside the house for a period of time, defendant called the shots by repeatedly texting his brother to alert the group when he wanted Jayontay and Arthur to enter the house (while armed) to complete the planned robbery. Defendant also tried to contain B. and S. in the bathroom as part of the plan. Based on the totality of the evidence, the court specifically found "defendant was a major participant, that [defendant] knew there were firearms involved, [defendant] was calling the shots with his cell phone, the texts he was sending out, in that he acted with reckless indifference to human life, and as a result [Timothy] was killed."

Defendant timely appealed.

8

DISCUSSION

I

*Senate Bill No. 1437*

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) overhauled the state's murder statutes to more equitably sentence offenders according to their involvement in homicide offenses.  (Stats. 2018, ch. 1015, § 1.)  Senate Bill No. 1437 amended section 188 to require that a principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and amended section 189 to state that a person can be liable for felony murder only if:  (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.)  These ameliorative changes eliminated murder based on the natural and probable consequences doctrine or other imputed malice theories based solely on a person's participation in a crime and narrowed the first degree felony murder rule.  (§ 188, subd. (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime"]; *People v. Strong* (2002) 13 Cal.5th 698, 707 (*Strong*) [Senate Bill No. 1437 "significantly limited the scope of the felony-murder rule"].)  The Legislature has since expanded eligibility for relief to those convicted of manslaughter.  (Stats. 2021, ch. 551, § 2 (Sen. Bill No. 775); § 1172.6, subd. (a).)

Individuals convicted under the former law may "seek retroactive relief under the law as amended" pursuant to section 1172.6 (formerly section 1170.95).  (*Strong, supra*, 13 Cal.5th at p.  708 & fn. 2.)  Where, like here, the trial court issues an order to show cause and holds an evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder under California law as amended by the changes to section 188 or 189 made effective by Senate Bill No. 1437.

9

(§ 1172.6, subd. (d)(3).)  The parties may offer evidence from a prior trial or hearing, or offer new or additional evidence.  (*Ibid.*)

We review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence.  (*People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).)  "Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

We examine " 'the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' "  (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.)  "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence."  (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.)  "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

## II

### *Reckless Indifference*

Defendant challenges the trial court's major participant and reckless indifference findings.  Viewing the appellate record in the light most favorable to the court's order, we agree with defendant's latter contention that substantial evidence does not support the court's reckless indifference finding.

When "Senate Bill No. 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*."[5]  (*Strong, supra*, 13 Cal.5th at p. 710.)  *Banks* and *Clark*, in turn, utilized *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 as "guideposts" to delineate the contours of the major participant and reckless indifference standards for felony murder.[6]  (*Strong*, at p. 705; *Emanuel, supra*, 17 Cal.5th at p. 882 [*Tison* and *Enmund* "articulate the constitutional limits of capital punishment for accomplices to felony murder"].)

*Banks* explained that when determining whether a defendant is a "major participant" in a felony murder, the jury may consider the defendant's role in the planning and criminal enterprise that led to death, the defendant's role in supplying or using weapons, his awareness of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants, whether the defendant was present at the scene of the killing, was in a position to facilitate or prevent the actual murder and whether his own actions or inactions played a particular role in the death, and what the defendant did after lethal force was used.  (*Banks, supra*, 61 Cal.4th at p. 803.)

---

[5]  *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

[6]  On one end of the spectrum, the defendant in *Enmund* was not eligible for the death penalty where he drove accomplices to the victim's home for an armed robbery, remained in the car as the getaway driver, did not intend to kill, and was not present when the killing occurred.  (*Enmund v. Florida, supra*, 458 U.S. at pp. 784, 791, 801.)  At the other end of the spectrum, the defendant in *Tison* was death penalty eligible as a major participant who acted with reckless indifference to human life where he broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the dessert after the escapees shot them.  (*Tison, supra*, 481 U.S. at p. 152.)

11

When deciding whether a defendant acted with "reckless indifference to human life" under *Clark*, the jury may consider such factors as the use and number of weapons and the defendant's knowledge of them, the duration of the felony, the defendant's physical presence at the scene of the killing and opportunities to stop the crime or aid the victim, the defendant's knowledge that his criminal partner was likely to kill and the defendant's effort to minimize the risk of the felony. (*Clark, supra*, 63 Cal.4th at pp. 618-623.) In *Clark*, our Supreme Court found the evidence was insufficient to show the defendant there acted with reckless indifference to human life in the armed robbery of a computer store, where he planned the robbery but was not armed or physically present in the store when the victim was shot, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for when fewer people would be present and using an unloaded gun. (*Id.*, at pp. 611, 618-623.) A defendant's youth can also be a relevant factor in the reckless indifference analysis. (*People v. Keel* (2022) 84 Cal.App.5th 546, 558-559.)

No one of the *Banks* or *Clark* factors "is necessary, nor is any one of them necessarily sufficient" to establish a defendant was a major participant or acted recklessly indifferent to a grave risk of death during an offense. (*Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra*, 63 Cal.4th at p. 618.)

Here, at least one of the *Banks* major participant factors is present. For example, as the trial court recognized, defendant did play a prominent role in planning and directing the in-home robbery that led to Timothy's death. We have described his participation in this regard at length, *ante*. But even assuming for the sake of argument that, under the circumstances of this case, defendant was a major participant here, reversal is required because the evidence was insufficient to support the trial court's finding that he exhibited reckless indifference to human life, as we next discuss.

Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark, supra*, 63 Cal.4th at

12

p. 616.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Id.* at p. 617.)  Recklessness has both a subjective and an objective component.  (*Ibid.*)  Subjectively, the defendant must consciously disregard risks known to him.  (*Ibid.*)  Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' "  (*Ibid.*)  "[P]articipation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference."  (*Emanuel, supra*, 17 Cal.5th at p. 884; see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 [" 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life"].)

The *Clark* factors regarding defendant's knowledge of his cohort's likelihood of killing and his use of or awareness of the presence of weapons do not give rise to a particularly strong inference of culpability here.  The evidence showed defendant did not know Jayontay and Arthur well, and neither did Gatison or Jones.  No evidence showed defendant had previously participated in violent conduct with Jayontay and Arthur or that he knew either of the brothers had a propensity for violence or were likely to use lethal force during the robbery.

The record does not make clear what defendant meant when he said Jayontay got a "sick look" on his face when defendant mentioned the "weed and pills."  But because defendant denied knowing Jayontay well, it is not reasonable to infer that the "look" alone made defendant aware that Jayontay was likely to kill during the robbery.  Defendant also warned Jayontay not to do anything that would jeopardize defendant's freedom, and to "[b]e cool" because he knew the people at the house, he used to live

13

there, and he "still love[d]" B., which implies that defendant's plan did not include violence against those in the house.

To the extent the trial court could reasonably infer defendant knew Jayontay or Arthur, or both, would be armed, that inference alone does not show defendant acted recklessly indifferent during the planned robbery. "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 618; *Banks, supra*, 61 Cal.4th at p. 809.) Even assuming defendant was aware Jayontay or Arthur would be armed, there was no evidence that defendant provided one or both with a firearm, or that defendant instructed either man to fire his weapon.

While it is true that "[a] defendant's *use* of a firearm, even if the defendant does not kill the victim" can "be significant to the analysis of reckless indifference to human life" (*Clark, supra*, 63 Cal.4th at p. 618), the trial court did not reference defendant using a gun as a basis for denying the petition. Moreover, as defendant argues, and our review of the portion of the preliminary hearing transcript submitted at the section 1172.6 hearing confirms, there was no evidence presented showing he himself had a weapon during the incident. S. never testified that she saw defendant with a firearm. Instead, she said only that one of the intruders (who was not defendant) pointed a gun at her. We therefore conclude that defendant's awareness of or use of a weapon is, at most, neutral.

Regarding the duration of the crime, courts have recognized that "[a] lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence." (*Emanuel, supra*, 17 Cal.5th at p. 886.) The trial court here intimated that the crime lasted a lengthy period. But most of that time defendant visited with B. and her housemates, waiting for Timothy to leave. At one point, defendant even asked B. to go to the store and take the dog for a walk. As the court noted, defendant did not physically restrain any of the residents and it does not appear they were even aware that defendant and his cohorts were planning to steal

14

marijuana from the house. Based on S.'s and Michael's testimony, the time between when Jayontay and Arthur entered the house to when Timothy was shot and killed was as brief as a minute. (Cf. *Emanuel* at p. 886 [victim shot after a brief struggle; there was no prolonged period of restraint and the interaction appeared nonviolent until the victim refused to relinquish drugs without payment].)

The duration of the crime in this case differs markedly from the protracted hostage situation in *Tison* where the four victims were kidnapped and held at gunpoint until the defendants' father and his cellmate, both convicted murderers and prison escapees, eventually decided to shoot and kill them. (*Tison, supra*, 481 U.S. at pp. 139-141.) Under the circumstances presented here, the felony's duration did nothing to increase the risk of violence beyond that inherent in the crime. This factor is neutral at best.

The next *Clark* factor--defendant's efforts at the planning stage to minimize the risk of violence in the commission of the felony--weighs in defendant's favor. In *Clark*, our Supreme Court found significant the fact that the defendant arranged for the robbery to take place after business hours, when few employees would be present, and planned for the robbery to involve only one unloaded gun. (*Clark, supra*, 63 Cal.4th at pp. 621-622.) Although the facts here differ somewhat, the evidence does show that defendant took steps when planning the robbery to lessen the risk anyone would be harmed. He warned Jayontay to be "cool" and he emphasized that he still loved B. and knew her roommates. Once inside the house, he tried to time the robbery for when Timothy was out of the house, thereby decreasing the chance of the robbers encountering any resistance. He also planned to try to contain the other residents in one room, together and presumably out of harm's way, while Jayontay and Arthur came in unimpeded and grabbed the tote of marijuana.

The trial court does not appear to have directly addressed the *Clark* factors concerning defendant's physical presence at the scene and opportunity to restrain the violence or aid the victim. "Proximity to the murder and the events leading up to it may

15

be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark, supra*, 63 Cal.4th at p. 619.) Where a defendant's presence allows him to observe his cohorts, a court may fairly infer that he shared in their actions and mental state. (*Emanuel, supra*, 17 Cal.5th at p. 889.) When a defendant is present but fails to act as a restraining influence if an opportunity arises, he is arguably more culpable for the resulting murders. (*Ibid.*)

Here, it is undisputed defendant was at the scene for a time leading up to the deadly encounter. The evidence, however, conflicts as to whether defendant was inside the house when the actual shooting occurred. S. testified that once Jayontay and Arthur burst into the house, she no longer saw defendant, implying that he fled almost immediately from the house. However, at some point during his police interview, defendant told Detective Schluer that he was in the house "kickin it" with B. when the others kicked in the door, after which he heard a gunshot in the kitchen while he was standing in the hall or living room.

In any event, the evidence does show defendant was unaware that Timothy told S. he was headed back to the house. When Timothy arrived shortly thereafter, he added unexpected resistance to the mix. The brief, one-minute struggle quickly escalated, and Timothy was shot in the chest. If defendant fled from the house, he had no meaningful opportunity to observe the others' actions or otherwise restrain them when they unexpectedly encountered Timothy. If defendant remained inside the house, the evidence shows the deadly encounter between Timothy and the others happened so fast while defendant was in a different room that, again, he had no meaningful opportunity to restrain the shooter.

Further, we do not find defendant's actions after the shooting to be particularly probative of his mental state at the time of the robbery. (*In re Scroggins, supra*, 9 Cal.5th

16

at p. 679 [where "different inferences may be drawn" from the evidence, a defendant's post-shooting actions may not be probative of his mental state].)  Defendant first claimed he found out Timothy had been shot the day before he was arrested (nearly 10 days after the incident), but other evidence tended to show he rode back with the group to San Pablo, and, at some point while in the car, Jayontay and Arthur acknowledged "some shit" happened inside the house and someone "got shot."

If defendant did not know Timothy had been shot until days later, his failure to immediately render aid is understandable.  If, on the other hand, defendant learned of the shooting that night, nothing indicates he went back to the scene to check on Timothy or provide aid.  Nevertheless, defendant knew at least three other adults who could provide aid to Timothy remained inside the house.  Defendant did nothing to prevent or interfere with their providing help to Timothy; indeed, S. immediately called 911 and secured aid. Under these circumstances, defendant's post-shooting actions do not weigh heavily in favor of finding reckless indifference.

Finally, we recognize that defendant's youth does have some bearing on his recklessness.  (*People v. Keel, supra*, 84 Cal.App.5th at p. 562 [a person's youth can interfere with his or her ability to appreciate the risks and consequences of their conduct].)  Youthful offenders are often more impulsive and vulnerable to peer pressure than adults.  (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.)  Here, although defendant cried throughout his police interview, which suggests immaturity, there is scant evidence that defendant felt compelled or peer pressured to assist with the robbery. Defendant's age and maturity and his apparent ability to withstand peer pressure appear neutral in the reckless indifference analysis.

In sum, the totality of the evidence does not show that at the time of the underlying felony defendant "consciously disregard[ed] 'the significant risk of death his . . . actions create[d].' " (*In re Scroggins, supra*, 9 Cal.5th at p. 677.)  Only knowingly creating a grave risk of death satisfies this requirement (*ibid.*), and the evidence here falls

17

short of that benchmark.  Defendant planned and participated in a garden-variety armed robbery with others whom he did not know would take lethal action.  He tried to minimize the risk of harm during the robbery by holding the others off until the person who was most likely to resist left the house.  And the fleeting nature of the deadly interaction, which occurred when defendant may not have even been present or close by, provided him with no meaningful opportunity to restrain his cohorts.  He did not prevent other individuals in the house from seeking aid for Timothy and emergency aid was rendered shortly after the shooting.  Under these circumstances, insufficient evidence shows that defendant possessed the necessary mental state of reckless indifference section 189, subdivision (e)(3) and interpretive caselaw now requires.

DISPOSITION

The order denying defendant's section 1172.6 petition is reversed and the matter is remanded for the trial court with instructions to vacate defendant's voluntary manslaughter conviction, and the attached firearm use enhancement, and to resentence defendant on the remaining charges.  (See § 1172.6, subds. (d)(3), (e).)


                                               /s/
                                        Duarte, J.


We concur:


         /s/
Robie, Acting P. J.


         /s/
Krause, J.